EXECUTION COPY

**LOAN AGREEMENT**

**Dated as of July 30, 2007**

between

**ACCESSDATA CORP.**

as Borrower

and

**LAMASSU CAPITAL, L.P.**

as Lender

# TABLE OF CONTENTS

Page

ARTICLE I CERTAIN DEFINITIONS ............................................................................................ 1

    Section 1.1      Definitions ........................................................................................... 1

ARTICLE II GENERAL TERMS ................................................................................................... 8

    Section 2.1      Loan Amount.......................................................................................... 8
    Section 2.2      Option to Convert Loan Amount Into Common Stock of Borrower............. 8
    Section 2.3      Adjustment for Change in Borrower's Common Stock ............................... 10
    Section 2.4      Additional Funding................................................................................. 11
    Section 2.5      Repayment; Maturity .............................................................................. 11
    Section 2.6      Payments and Computations ................................................................... 11
    Section 2.7      Financing Documentation....................................................................... 11
    Section 2.8      Use of Proceeds .................................................................................... 11
    Section 2.9      Fees and Expenses................................................................................. 11

ARTICLE III REPRESENTATIONS AND WARRANTIES.............................................................. 12

    Section 3.1      Representations and Warranties of Borrower............................................ 12
    Section 3.2      Survival of Borrower's Representations.................................................... 14
    Section 3.3      Representations and Warranties of Lender................................................ 14

ARTICLE IV CLOSING CONDITIONS......................................................................................... 15

    Section 4.1      Closing Conditions................................................................................. 15

ARTICLE V AFFIRMATIVE COVENANTS.................................................................................. 16

    Section 5.1      Affirmative Covenants ............................................................................ 16
    Section 5.2      Borrower Operations: Corporate Solutions Division and Computer
                       Forensic Division.................................................................................. 19

ARTICLE VI NEGATIVE COVENANTS ...................................................................................... 20

    Section 6.1      Negative Covenants................................................................................ 20

ARTICLE VII EVENT OF DEFAULT............................................................................................ 22

    Section 7.1      Event of Default..................................................................................... 22
    Section 7.2      Remedies .............................................................................................. 23
    Section 7.3      Remedies Cumulative............................................................................. 23
    Section 7.4      Curative Advances................................................................................. 24

ARTICLE VIII MISCELLANEOUS ............................................................................................. 24

    Section 8.1      Survival:................................................................................................ 24
    Section 8.2      Lender's Discretion ................................................................................ 24
    Section 8.3      Governing Law ...................................................................................... 24
    Section 8.4      Modification, Waiver in Writing............................................................. 25
    Section 8.5      Delay Not a Waiver ............................................................................... 25
    Section 8.6      Notices................................................................................................. 25

Section 8.7      Trial By Jury ................................................................................. 25
Section 8.8      Headings ...................................................................................... 26
Section 8.9      Assignment ................................................................................... 26
Section 8.10     Severability ................................................................................. 26
Section 8.11     Preferences................................................................................... 26
Section 8.12     Waiver of Notice .......................................................................... 27
Section 8.13     Failure to Consent......................................................................... 27
Section 8.14     Offsets, Counterclaims and Defenses ............................................ 27
Section 8.15     No Joint Venture or Partnership ..................................................... 27
Section 8.16     Waiver of Marshalling of Assets Defense ....................................... 27
Section 8.17     Waiver of Counterclaim ................................................................ 27
Section 8.18     Conflict; Construction of Documents.............................................. 28
Section 8.19     Brokers and Financial Advisors ..................................................... 28
Section 8.20     Counterparts................................................................................. 28
Section 8.21     Estoppel Certificates..................................................................... 28

ARTICLE IX BANKRUPTCY ......................................................................... 28

Section 9.1      Material Inducement...................................................................... 28
Section 9.2      No Fraudulent Intent...................................................................... 28
Section 9.3      No Bankruptcy Intent .................................................................... 29
Section 9.4      Agreement in Best Interests of Parties, Consideration .................... 29


SCHEDULE I     -     USE OF PROCEEDS AND DRAW-DOWN REQUIREMENTS

SCHEDULE II    -     FORM OF NOTICE OF BORROWING

EXHIBIT A      -     UNSECURED PROMISSORY NOTE

## LOAN AGREEMENT

LOAN AGREEMENT (this "Agreement"), dated as of July 30, 2007, by and between LAMASSU CAPITAL, L.P., a Delaware limited partnership ("Lender") and ACCESS DATA CORP., a Utah corporation ("Borrower").

## W I T N E S S E T H

WHEREAS, Borrower desires to borrow from Lender, and Lender desires to lend to Borrower, certain loans described herein subject to the terms and conditions of this Agreement, for the purpose of providing Borrower with needed financing;

WHEREAS, Borrower and Lender desire that the loan amounts under this Agreement and Borrower's repayment obligation thereof be evidenced by the unsecured note in the form of Exhibit A annexed hereto (the "Note");

WHEREAS, Borrower and Lender desire that in connection with Borrower's obligations hereunder, Borrower grant Lender an option (i) to convert into shares of Borrower's common stock (on the terms and conditions specified in this Agreement) all or any part of any drawn amount and (ii) convert into shares of Borrower's common stock all or part of any undrawn amount, in case of both (i) and (ii), of the Loan Amount (as hereinafter defined);

WHEREAS, immediately prior to the execution hereof, Lender and stockholders of Borrower have entered into that certain Investor Rights Agreement, dated as of the date hereof ("Investor Rights Agreement"), to set forth the parties' agreement with respect to the Company's governance and certain voting rights of Purchaser and other matters described therein;

WHEREAS, simultaneously herewith, Lender and certain stockholders of Borrower, have entered into that certain Stock Purchase Agreement, dated as of the date hereof; and

WHEREAS, NOW, THEREFORE, in consideration of the foregoing premises, and the covenants herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

Section 1.1    Definitions.  For all purposes of this Agreement:  (i) the capitalized terms defined in this Article I have the meanings assigned to them in this Article I and include the plural as well as the singular; (ii) all accounting terms have the meanings assigned to them in accordance with GAAP (as hereinafter defined); (iii) the words "herein", "hereof", and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other subdivision; and (iv) the following terms have the following meanings:

"Additional Portion" has the meaning set forth in Section 2.1 hereof.

"Affiliate" of any specified Person means any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; and the terms "controlling" and "controlled" have the meanings correlative to the foregoing.

"Agreement" means this Agreement, as the same may be modified, amended, restated, supplemented and/or extended from time to time.

"Bankruptcy Code" means Title 11, U.S.C.A., as amended from time to time or any successor statute thereto.

"Borrower" has the meaning provided in the preamble to this Agreement.

"Business Day" means any day other than a Saturday, a Sunday or a day on which commercial banks in the City of New York are authorized or obligated by law, governmental decree or executive order to be closed.

"Closing Date" has the meaning set forth in Section 2.1 hereof.

"Code" means the Internal Revenue Code of 1986, as amended, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Common Stock" means the common stock of Borrower, without par value.

"Contingent Obligation" means, as used in the definition of Other Borrowings, without duplication, any obligation of Borrower guaranteeing or indemnifying against any indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly. Without limiting the generality of the foregoing, the term "Contingent Obligation" shall include any obligation of Borrower, whether or not contingent:

(i)     to purchase any such primary obligation or any property constituting direct or indirect security therefor;

.(ii)     to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor;

(iii)     to purchase property, securities or services for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or

(iv)     otherwise to assure or hold harmless the owner of such primary obligation against loss in respect thereof.

2

The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming Borrower is required to perform thereunder) as determined by Lender in good faith.

"Dilutive Transaction has the meaning set forth in Section 2.3(b) hereof.

"Environmental Claim" means any notice, notification, request for information, claim, administrative, regulatory or judicial action, suit, judgment, demand or other written communication by any Person or Governmental Authority alleging or asserting liability with respect to Borrower (whether for damages, contribution, indemnification, cost recovery, compensation, injunctive relief, investigatory, response, remedial or cleanup costs, damages to natural resources, personal injuries, fines or penalties) arising out of, based on or resulting from (i) the presence, use or Release into the environment of any Hazardous Substance at any location (whether or not owned, managed or operated by Borrower) that affects Borrower, (ii) any fact, circumstance, condition or occurrence forming the basis of any violation, or alleged violation, of any Environmental Law or (iii) any alleged injury or threat of injury to human health, safety or the environment.

"Environmental Laws" means any and all present and future federal, state or local laws, statutes, ordinances or regulations or any judicial interpretation thereof, any judicial or administrative orders, decrees or judgments thereunder issued by a Governmental Authority, and any permits, approvals, licenses, registrations, filings and authorizations, in each case as now or hereafter in effect, relating to the environment, human health or safety, or the Release or threatened Release of Hazardous Substances or otherwise relating to the Use of Hazardous Substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means any corporation or trade or business that is a member of any group of organizations (i) described in Section 414(b) or (c) of the Code of which Borrower is a member and (ii) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which Borrower is a member.

"Event of Default" has the meaning set forth in Section 7.1 hereof.

"Exercise Amount" has the meaning set forth in Section 2.2(a) hereof.

"Exercise Notice" has the meaning set forth in Section 2.2(a) hereof.

"Financing Documents" has the meaning set forth in Section 2.7 hereof.

"Fiscal Year" means the 12-month period ending on December 31st of each year (or, in the case of the first fiscal year, such shorter period from the Closing Date through such date) or

3

such other fiscal year of Borrower as Borrower may select from time to time with the prior consent of Lender.

"Fund" has the meaning set forth in the definition of "Permitted Investments."

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governing Documents" means the Amended and Restated Articles of Incorporation of Borrower, dated June 25, 2003 and Amended and Restated Bylaws of Borrower dated April 1, 2002.

"Governmental Authority" means any national or federal government, any state, regional, local or other political subdivision thereof with jurisdiction and any Person with jurisdiction exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Hazardous Substance" means, collectively, (i) any petroleum or petroleum products or waste oils, explosives, radioactive materials, asbestos, urea, formaldehyde, foam insulation, polychlonnated biphenyls ("PCBs"), lead in drinking water, lead-based paint and radon, (ii) any chemicals or other materials or substances which are now or hereafter become defined as or included in the definitions of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "contaminants," "pollutants" or words of similar import under any Environmental Law and (iii) any other chemical or any other hazardous material or substance, exposure to which is now or hereafter prohibited, limited or regulated under any Environmental Law.

"Indebtedness" means the Principal Indebtedness, together with all other obligations and liabilities due or to become due to Lender pursuant hereto, under the Note or in accordance with any of the other Financing Documents, and all other amounts, sums and expenses paid by or payable to Lender hereunder or pursuant to the Note or any of the other Financing Documents.

"Indemnified Parties" has the meaning set forth in Section 5.1(d) hereof.

"Initial Portion" has the meaning set forth in Section 2.1 hereof.

"Investor Rights Agreement" has the meaning set forth in recitals hereof.

"Legal Requirements" means all governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities (including, without limitation, Environmental Laws) affecting the entity or property referred to or any part thereof or the construction, use, alteration or operation thereof, or any part thereof (whether now or hereafter enacted and in force), and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, at any time in force affecting the applicable property or any part thereof (including, without limitation, any which may (i) require repairs, modifications or alterations in or to the applicable property or any part thereof, or (ii) in any way limit the use and enjoyment thereat).

4

"Lender" has the meaning provided in the preamble to this Agreement.

"Lien" means any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, assignment, security interest, or any other encumbrance or charge on or affecting the entity or property (or portion thereof) referred to or any interest therein (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement or similar instrument under the UCC or comparable law of any other jurisdiction, domestic or foreign, and mechanic's, materialmen's and other similar liens and encumbrances).

"Loan Amount" has the meaning set forth in Section 2.1 hereof.

"Losses" has the meaning set forth in Section 5.1(d) hereof.

"Material Adverse Effect" means a material adverse effect upon (i) the business operations, properties, assets, condition (financial or otherwise) or prospects of Borrower, or (ii) the ability of Borrower to perform, or of Lender to enforce, any of the Financing Documents.

"Maturity Date" means the twenty-year anniversary of the Closing Date.

"Money" means all of Borrower's right, title and interest, whether now owned or hereafter acquired in, to and under all "money" as defined in the UCC.

"Multiemployer Plan" means a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been, or were required to have been, made by Borrower and which is covered by Title IV of ERISA.

"Net Cash Flow" has the meaning set forth in Section 2.3(b) hereof.

"Net Cash Flow Report" has the meaning set forth in Section 5.1(k) hereof.

"Note" has the meaning set forth in the preamble to this Agreement.

"Option" has the meaning set forth in Section 2.2(a) hereof.

"Officer's Certificate" means a certificate delivered to Lender by Borrower which is signed by an authorized officer of Borrower.

"Other Borrowings" means, with respect to Borrower, without duplication (but not including the Indebtedness) (i) all indebtedness of Borrower for borrowed money or for the deferred purchase price of property or services, (ii) all indebtedness of Borrower evidenced by a note, bond, debenture or similar instrument, (iii) the face amount of all letters of credit issued for the account of Borrower and, without duplication, all unreimbursed amounts drawn thereunder, and obligations evidenced by bankers' acceptances, (iv) all indebtedness of Borrower secured by a Lien on any property owned by Borrower (whether or not such indebtedness has been assumed), (v) all Contingent Obligations of Borrower, (vi) liabilities and obligations for the payment of money relating to a capitalized lease obligation or sale/leaseback obligation, (vii) liabilities and obligations representing the balance deferred and unpaid of the purchase price of

5

any property or services, except those incurred in the ordinary course of business that would constitute ordinarily a trade payable to trade creditors, and (viii) all payment obligations of Borrower under any interest rate protection agreement (including, without limitation, any interest rate swaps, caps, floors, collars or similar agreements), foreign exchange contracts (including without limitations currency swap arrangements or arrangements designed to protect against changes in currency values) and, in each case, similar agreements.

"PBGC" means the Pension Benefit Guaranty Corporation established under ERISA, or any successor thereto.

"Permitted Investments" means any one or more of the following obligations or securities acquired at a purchase price of not greater than par:

(i)   obligations of, or obligations fully guaranteed as to payment of principal and interest by, the United States or any agency or instrumentality thereof provided such obligations are backed by the full faith and credit of the United States of America;

(ii)   obligations of the following United States of America government sponsored agencies: Federal Home Loan Mortgage Corp. (debt obligations), the Farm Credit System (consolidated system wide bonds and notes), the Federal Home Loan Banks (consolidated debt obligations), the Federal National Mortgage Association (debt obligations), the Financing Corp. (debt obligations), and the Resolution Funding Corp, (debt obligations);

(iii)   federal funds, unsecured certificates of deposit, time deposits, bankers' acceptances and repurchase agreements with maturities of not more than 365 days of any bank, the short-term obligations of which are rated in the highest short-term rating category by the Rating Agencies (at least one of which must be Standard & Poor's Ratings Services);

(iv)   unsecured certificates of deposit, time deposits, federal funds or banker's acceptances issued by any depository institution or trust company incorporated under the laws of the United States or of any state thereof and subject to supervision and examination by federal and/or state banking authorities, which investments are fully insured by the Federal Deposit Insurance Corp.;

(v)   debt obligations with maturities of not more than 365 days and rated by the Rating Agencies in its highest long-term unsecured rating category;

(vi)   commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than one year after the date of issuance thereof) with maturities of not more than 270 days and that is rated by the Rating Agencies in their highest short-term unsecured debt rating;

(vii)   (the Federated Prime Obligation Money Market Fund (the "Fund") so long as the Fund is rated "AAAm" or "AAAm-G" (or the equivalent) by the Rating Agencies; or

(viii)   any other demand, money market or time deposit, demand obligation or any other obligation, security or investment, which Lender shall have approved in writing and for which, if

6

the loans provided hereunder have been included in a Secondary Market Transaction in which Securities are issued, Borrower shall have delivered a Rating Confirmation;

provided, however, that (A) the investments described in clauses (i) through (viii) above must have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (C) such investments must not be subject to liquidation prior to their maturity or have an "r" highlighter affixed to its rating; and provided, further, that, in the judgment of Lender, such instrument continues to qualify as a "cash flow investment" pursuant to Code Section 860G(a)(6) earning a passive return in the nature of interest and that no instrument or security shall be a Permitted Investment if such instrument or security evidences (x) a right to receive only interest payments or (y) the right to receive principal and interest payments derived from an underlying investment at a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.

"Person" means any individual, corporation, limited liability company, partnership, joint venture, estate, trust unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Plan" means an employee benefit or other plan, other than a Multiemployer Plan, that is covered by Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code, and (i) to which Borrower or any ERISA Affiliate makes, or is obligated to make contributions or (ii) with respect to which Borrower could reasonably be expected to incur liability.

"Principal Indebtedness" means the principal amount of the loans provided hereunder outstanding as adjusted by each increase made in accordance with the terms of this Agreement and/or any other Financing Document, from time to time.

"Proceeds" shall have the meaning given in the UCC.

"Related Party" means any direct or indirect partner, member, shareholder, principal, Affiliate, employee, officer, director, agent or representative of Borrower.

"Release" means any active or passive release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment (including, without limitation, the movement of Hazardous Substances through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata).

"Second Portion" has the meaning set forth in Section 2.1 hereof.

"Third Portion" has the meaning set forth in Section 2.1 hereof.

"Transaction" means the transaction contemplated by the Financing Documents.

"Transfer" means the conveyance, assignment, sale, mortgaging, encumbrance, pledging, hypothecation, granting of a security interest in, granting of options with respect to, or other

disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) all or any portion of any legal or beneficial interest in Borrower.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"Undrawn Amount" shall have the meaning set forth in Section 2.2(a).

"Welfare Plan" means an "employee welfare benefit plan" as defined in Section 3(l) of ERISA established or maintained by Borrower or that covers any current or former employee of Borrower with respect to such current or former employee's employment with Borrower or any ERISA Affiliate.

## ARTICLE II

### GENERAL TERMS

Section 2.1   Loan Amount.   Lender shall, subject to the terms and conditions specified herein, provide loans in favor of Borrower in aggregate principal amount not to exceed Eighteen Million Eight Hundred and Thirty-Two Thousand and Two Hundred and Ninety Seven and 00/100 Dollars ($18,832,297.00) ("Loan Amount").   On the Closing Date, Five Million Eight Hundred and Sixty Nine Thousand, Eight Hundred and Three and 94/100 Dollars ($5,869,803.94) ("Initial Portion") of the Loan Amount will be disbursable to Borrower in accordance with the terms of the Note and under the terms and conditions set forth in Schedule I annexed hereto.   Borrower may draw the remaining Twelve Million Nine Hundred and Sixty Two Thousand Four Hundred and Ninety Three and 38/100 Dollars ($12,962,493.38) (the "Additional Portion") of the Loan Amount in the "Second Portion" not to exceed Four Million Five Hundred and Ninety Five Thousand and Six Hundred and Ninety Seven and 06/100 Dollars ($4,595,697.06) and "Third Portion" not to exceed Eight Million Three Hundred and Sixty Six Thousand Seven Hundred and Ninety Six and 32/100 Dollars ($8,366,796.32) respectively, in multiple draws under the terms and conditions set forth in Schedule I annexed hereto.

The outstanding principal balance of the Loan Amount shall bear interest at a rate of zero percent (0%).

At the time of each draw Borrower shall provide Lender with a written request of borrowing, in the form of Schedule II annexed hereto.

Section 2.2   Option to Convert Loan Amount Into Common Stock of Borrower.

(a)   Borrower hereby grants Lender an option ("Option"), exercisable in Lender's sole discretion, to convert (without payment of any consideration) all or any portion of the Loan Amount into the Common Stock, from time to time, upon providing Borrower with five-day's prior written notice ("Exercise Notice") in accordance with Section 8.6, which notice shall specify the following: (i) the amount of either the Initial Portion or the Additional Portion, as applicable, to be converted into shares of Common Stock, at the applicable share price determined in accordance with the terms of this Agreement ("Exercise Amount") and (ii) in case

8

of an Exercise Amount under the Additional Portion, whether such Exercise Amount represents a drawn or undrawn portion thereof and upon the following terms and conditions:

(i)     Lender may convert all or part of the Initial Portion into Common Stock as follows:

$$\frac{\text{Amount of conversion}}{\$1.99} = \text{Number of shares of Common Stock received}$$

(ii)    Lender may (x) convert all or part of the Second Portion that has been drawn by Borrower and (y) convert all or part of the Second Portion that has not been drawn by Borrower ("Second Portion Undrawn Amount") into, in each case, shares of Common Stock of Borrower as follows:

$$\frac{\text{Amount of conversion}}{\$3.12} = \text{Number of shares of Common Stock received}$$

The $3.12 amount used in the formula above is subject to adjustment as set forth in Schedule I – Second Portion – Use of Proceeds and Triggers.

In the event the Exercise Amount represents a Second Portion Undrawn Amount, the Exercise Notice shall be accompanied by payment in full of such Second Portion Undrawn Amount to Borrower.

(iii)   Lender may (x) convert all or part of the Third Portion that has been drawn by Borrower and (y) convert all or part of the Third Portion that has not been drawn by Borrower ("Third Portion Undrawn Amount") into, in each case, shares of Common Stock of Borrower as follows:

$$\frac{\text{Amount of conversion}}{\$4.18} = \text{Number of shares of Common Stock received}$$

The $4.18 amount used in the formula above is subject to adjustment as set forth in Schedule I – Third Portion – Use of Proceeds and Triggers.

In the event the Exercise Amount represents a Third Portion Undrawn Amount, the Exercise Notice shall be accompanied by payment in full of such Third Portion Undrawn Amount to Borrower.

(iv)    Borrower hereby covenants and agrees that it will at all times ensure that the requisite number of shares of Common Stock covered by this Agreement are authorized and available exclusively to Lender for conversion hereunder.

(b)     Borrower covenants that all of such shares of Common Stock, will, upon issue, be fully paid, non-assessable, free of preemptive rights and free from all Liens, charges and security interests with respect to the issue thereof.

9

(c)    Such conversion will be deemed to have occurred upon Lender's delivery of the applicable Exercise Notice. As soon as practicable after Lender has delivered the Exercise Notice, but in no event later than three (3) Business Days thereafter, Borrower shall issue and transfer to Lender the number of shares of Common Stock as to which the Option has been exercised and shall deliver to Lender a certificate or certificates representing such number of shares.

Section 2.3    Adjustment for Change in Borrower's Common Stock.

(a)    If, after the date hereof and prior to full exercise of Lender's Option, Borrower:

(i)    makes a distribution on Common Stock in additional shares of Common Stock;

(ii)    subdivides outstanding shares of Common Stock into a greater number of shares of Common Stock;

(iii)    combines outstanding shares of Common Stock into a smaller number of shares of Common Stock; or

(iv)    issues additional shares of Common Stock or consummates any Dilutive Transaction (as defined in subsection (b) below);

then the number of shares of Common Stock issuable upon the exercise of the Option by Lender shall be adjusted so that Lender thereafter upon the exercise of the Option may receive the same proportional number of shares of Common Stock which it would have owned if Lender exercised its Option immediately prior to such action.

The adjustment shall become effective immediately after the record date in the case of a distribution and immediately after the effective date in the case of a subdivision or combination.

Such adjustment shall be made successively whenever any event listed above shall occur.

If Borrower takes any action that would require an adjustment to the number of shares of Common Stock issuable to Lender upon the exercise of the Option pursuant to this subsection (a), Borrower shall mail to Lender a notice stating the proposed record date for a distribution in accordance with the notice provisions of Section 8.6 hereof at least fifteen (15) days before such date and provide details relating to the required adjustment.

(b)    Issuance of Common Stock.

Borrower shall provide Lender with prompt notice of its intention to issue shares of Common Stock or enter into any other transaction ("Dilutive Transaction") that would result in dilution of Lender's potential ownership of Borrower's equity upon the exercise of the Option, except for issuances of shares of Common Stock pursuant to the exercise of the granted and outstanding options listed on Schedule 2.3(b) hereto. Borrower shall not issue shares of Common Stock or enter into any Dilutive Transaction without Lender's prior written consent,

10

which may be withheld for any and/or no reason, in Lender's sole discretion. If Lender consents to such Dilutive Transaction, the provisions of subsection (a) above shall apply.

Section 2.4    Additional Funding Borrower agrees that it will not seek any additional funding from any source without first giving Lender and its Affiliates an opportunity to provide such financing on terms no less favorable to Lender and its Affiliates than those to be entered into with such third party lender.

Section 2.5    Repayment; Maturity.    Borrower shall repay the outstanding Loan Amount to Lender on the Maturity Date. Upon any of the Borrower's obligations hereunder or becoming due and payable (by acceleration following an Event of Default or otherwise), Lender shall be entitled to immediate payment of such obligations.

Section 2.6    Payments and Computations.

(a)    The Borrower shall make each payment hereunder and under the Note no later than 3 P.M. (New York City time) on the day when due, in U.S. dollars, to Lender at accounts designated by Lender to Borrower by wire transfer of immediately available funds.

(b)    Whenever any payment hereunder or under the Note shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of the payment of fees.

Section 2.7    Financing Documentation.    On the Closing Date, Borrower shall deliver to the Company: (i) the Note and (ii) the other closing documents set forth in Section 4.1 hereof (the documents referred to in (i) through (ii) shall be collectively referred to as "Financing Documents").

Section 2.8    Use of Proceeds.    Borrower represents, warrants and covenants that any and all portions of the Loan Amount borrowed shall be applied solely as specified on Schedule I annexed hereto.

Section 2.9    Fees and Expenses    Borrower shall pay the reasonable fees and expenses of Lender including without limitation, legal fees and expenses, (i) incident to the negotiation, preparation, execution, delivery, performance or enforcement of this Agreement and related documents and (ii) related to Lender's due diligence efforts or otherwise related to this Agreement and related documents. Borrower and Lender agree that the amount of such expenses accrued up to the Closing Date and then identified shall be deducted from the Loan Amount funded to Borrower on the Closing Date. Thereafter, upon request of Lender, Borrower shall pay any reasonable additional fees and expenses (including, without limitation, legal expenses) incurred by the Lender and incident to the filing, negotiation, preparation, performance, amendment or enforcement of this Agreement and related documents, including enforcement of this provision.

11

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1    Representations and Warranties of Borrower  Borrower represents and warrants to Lender:

(a)    Organization.  Borrower (i) is duly organized, validly existing and in good standing under the laws of the State of Utah, (ii) has the requisite power and authority to own its properties and to carry on its business as now being conducted, and is qualified to do business in each jurisdiction in which its assets are located, and (iii) has the requisite power to execute and deliver, and perform its obligations under this Agreement, the Note and other Financing Documents.

(b)    Authorization; No Conflict; Consents and Approvals.  The execution and delivery by Borrower of this Agreement, the Note, the other Financing Documents, and each of the other documents executed by Borrower in connection with the loans to be made hereunder, and Borrower's performance of its obligations hereunder and thereunder (i) have been duly authorized by all requisite corporate action on the part of Borrower, (ii) will not violate any provision of any Legal Requirements, any order of any court or other Governmental Authority, the Borrower's organizational documents or any indenture or material agreement or other instrument to which Borrower is a party or by which Borrower is bound, and (iii) will not be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, or result in the creation or imposition of any Lien of any nature whatsoever upon any of the property or assets of Borrower, pursuant to, any such indenture or material agreement or instrument.  Other than those obtained or filed on or prior to the Closing Date, Borrower is not required to obtain any consent, approval or authorization from, or to file any declaration or statement with, any Governmental Authority or other agency in connection with or as a condition to the execution, delivery or performance of this Agreement, the Note or other Financing Documents.

(c)    Enforceability.  This Agreement, the Note, the other Financing Documents or any other documents executed by Borrower in connection with the loans to be made hereunder, is the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, subject to bankruptcy, insolvency, and other limitations on creditors' rights generally and to equitable principles.  This Agreement, the Note, the other Financing Documents and such other documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower (including the defense of usury), and Borrower has not asserted and will not assert any right of rescission, set-off, counterclaim or defense with respect thereto.

(d)    Litigation.  Except as disclosed to Lender in writing by Borrower prior to the date hereof, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending and served or, to the best knowledge of Borrower, threatened in writing against Borrower.

(e)    Agreements.  Listed on Schedule 3.1(e) hereto are all of the material agreements to which Borrower is a party or by which Borrower is bound.  Except as disclosed to Lender in

12

writing by Borrower prior to the date hereof, Borrower is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any material agreement or instrument to which it is a party or by which Borrower is bound. Borrower is not a party to any agreement or instrument or subject to any restriction by which it or its assets are bound which is reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

(f)     No Bankruptcy Filing.  Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property.

(g)     Solvency.  Giving effect to the transactions contemplated hereby, the fair value and fair saleable value of Borrower's assets exceeds and will, immediately following the making of any loans provided hereunder, exceed Borrower's total liabilities (including, without limitation, subordinated, unliquidated, disputed and contingent liabilities). Borrower's assets do not and, immediately following the making of the loans hereunder will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature.

(h)     Other Debt.  Except for the amounts owing hereunder and under the Note, Borrower has incurred no other indebtedness or Other Borrowings.

(i)     Full and Accurate Disclosure.  No statement of fact made by or on behalf of Borrower in this Agreement or in any of the other documents executed by Borrower in connection with the loans to be made hereunder contains any untrue statement of a material fact. All of the representations and warranties made by or on behalf of Borrower in this Agreement and the other documents executed by Borrower in connection with the loans to be made hereunder or any document or Instrument delivered to Lender pursuant to or in connection with any of such documents are true and correct as of the date hereof, and, to Borrower's knowledge, Borrower has not failed to disclose such information as is necessary to make such representations and warranties not misleading in any material respect

(j)     Investment Company Act.  Borrower is not an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended, or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(k)     Compliance.  Borrower is in material compliance with all applicable Legal Requirements. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, except for defaults or violations which are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

(l)     Use of Proceeds; Margin Regulations.  Borrower will use the proceeds of the loans provided hereunder solely for the purposes described in Schedule 1 annexed hereto. No part of the proceeds of the Loan Amount will be used for the purpose of purchasing or acquiring

13

any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements.

(m)     No Defaults.  No default or Event of Default exists under or with respect to any Financing Document.

(n)     Plans and Welfare Plans.  The assets of Borrower are not treated as "plan assets" (as defined in 29 C.F.R. § 2510.3-101) of any "employee benefit plan" (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA, or any "plan" (as defined in Section 4975 of the Code) which is subject to Section 4975 of the Code.

(o)     Taxes.  Borrower has filed all federal, state and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by such Person.  All tax returns that have been, or will be, filed, are complete and correct in all material respects.  All non-qualified plans, if any, comply with Section 409A of the Code.

(p)     Environmental Compliance.  Except as disclosed to Lender in writing by Borrower prior to the date hereof, Borrower is not subject to any applicable Environmental Law requiring the performance of Hazardous Substances site assessments, or the removal or remediation of Hazardous Substances, or the giving of notice to any governmental agency or the recording or delivery to other Persons of an environmental disclosure document or statement, in each case by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the recording of the Financing Documents or to the effectiveness of any other transactions contemplated hereby.

Section 3.2     Survival of Borrower's Representations.  Borrower agrees that (i) all of the representations and warranties of Borrower set forth in Section 3.1 and in the other Financing Documents delivered on the Closing Date are made as of the Closing Date, and (ii) all representations and warranties made by Borrower in this Agreement and any Financing Document shall survive the delivery of the Note and making of the loan hereunder and continue for so long as any amount remains owing to Lender under this Agreement, the Note or any of the other Financing Documents.  All representations, warranties, covenants and agreements made in this Agreement or in the other Financing Documents shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

Section 3.3     Representations and Warranties of Lender.

(a)     Lender represents and warrants to Borrower that Lender (i) understands that the Note has not been, and will not be, registered under the Securities Act or under any state securities laws, and is being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering; (ii) is acquiring the Note solely for its own account for investment purposes, and not with a view to the distribution thereof; (iii) is a sophisticated investor with knowledge and experience in business and financial matters; (iv) has

14

received certain information concerning the Company and has had the opportunity to obtain additional information as desired in order to evaluate the merits and the risks inherent in holding the Note; (v) is able to bear the economic risk and lack of liquidity inherent in holding the Note; and (vi) is an "Accredited Investor" as that term is defined under Rule 501 of the Securities Act.

(b)   Lender represents and warrants to Borrower that Lender will have the financial ability to fulfill its obligations under this Agreement as they become due and payable.

## ARTICLE IV

## CLOSING CONDITIONS

Section 4.1   Closing Conditions.   The provision of funds under the Initial Portion by Lender and Borrower's ability to draw amounts thereunder is subject to the satisfactions at or before the Closing Date of each of the conditions set forth below, unless waived by Lender.

(a)   Financing Documents and Investor Rights Agreement.   The Borrower shall have executed and delivered each of the Financing Documents to which it is a party and the Investor Rights Agreement executed by Borrower and the stockholders named therein.

(b)   Absence of Defaults.   No default or Event of Default shall have occurred immediately prior or after giving effect to the funding on the Closing Date.

(c)   Representations and Warranties.   The representations and warranties herein and in the other Financing Documents shall be true and correct in all respects.

(d)   Opinion of Counsel.   Lender shall have received from counsel to the Borrower legal opinions, in form and substance satisfactory to Lender (and Lender's counsel), with respect to corporate matters, enforceability of the Financing Documents and such other matters as Lender may request.

(e)   Formation Documents.   Lender shall have received Borrower's articles of incorporation, as amended, modified or supplemented to the Closing Date, as filed with the Secretary of State in the jurisdiction of organization and in effect on the Closing Date and certified to be true, correct and complete by the appropriate Secretary of State as of a date not more than thirty (30) days prior to the Closing Date, together with a good standing certificate from such Secretary of State and a good standing certificate from the Secretaries of State (or the equivalent thereof) of each other State in which Borrower is required to be qualified to transact business.

(f)   Certified Organizational Agreement and Resolutions, Etc.   Lender shall have received a certificate from Borrower, dated as of the Closing Date, certifying (i) the names and true signatures of its incumbent officers authorized to sign the Financing Documents to which Borrower is a party; (ii) that the organizational documents of Borrower, attached to the certificate are in effect on the Closing Date, and have not been modified since the date of its execution; and (iii) that the resolutions of Borrower, attached to the certificate approving and authorizing the execution, delivery and performance of the Financing Documents to which

15

Borrower is a party are in effect as of the Closing Date and that they are all resolutions of Borrower relating to the Financing Documents..

(g)     Additional Matters.  Lender shall have received such other certificates, opinions, documents and instruments relating to the loans to be made hereunder as may have been reasonably requested by Lender.  All corporate and other organizational proceedings, all other documents (including, without limitation, all documents referred to herein and not appearing as exhibits hereto) and all legal matters in connection with the loans to be made hereunder shall be reasonably satisfactory in form and substance to Lender (and Lender's counsel).

## ARTICLE V

## AFFIRMATIVE COVENANTS

Section 5.1     Affirmative Covenants.  Borrower covenants and agrees that, from the date hereof and until payment in full of the Indebtedness:

(a)     Existence; Compliance with Legal Requirements.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises necessary for the conduct of its business and comply with all Legal Requirements applicable to it and them.  Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property necessary for the continued conduct of its business.  Borrower covenants and agrees to give Lender prompt notice of any notice of non-compliance therewith which it receives or of any pending proceedings in respect thereto of which Borrower receives notice.  If at any time while the any amount of the Loan Amount is outstanding, any authorization, consent, approval, permit or license from any officer, agency or instrumentality of any government shall become necessary or required in order that Borrower may fulfill any of its obligations hereunder, Borrower will promptly take or cause to be taken all steps necessary to obtain such authorization, consent, approval, permit or license and furnish Lender with evidence thereof.  Borrower shall promptly notify Lender of the commencement of any contest or similar proceeding hereunder.

(b)     Taxes.  Borrower shall file or cause to be filed all federal, state and local tax returns required to be filed and shall pay or make adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by it.  Borrower shall pay all documentary stamp taxes attributable to the initial issuance of shares of its Common Stock issued upon Lender's exercise of the Option.

(c)     Litigation.  Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings or investigations pending or threatened against Borrower.

(d)     General Indemnity.

(i)     Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Lender and its partners, parents, subsidiaries, Affiliates, shareholders, directors, officers; employees, representatives, agents, successors and assigns (collectively, the "Indemnified Parties") for, from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), administrative and

16

judicial actions and proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, and litigation costs, of whatever kind or nature and whether or not incurred in connection with any judicial or administrative proceedings (including, but not limited to, reasonable attorneys' fees and other reasonable costs of defense including the cost and expenses of enforcing this indemnity) (the "Losses") imposed upon or incurred by or asserted against any Indemnified Parties (except to the extent same are caused by the fraud, bad faith, negligence or willful misconduct of any Indemnified Party), and directly or indirectly arising out of or in any way relating to any one or more of the following:

      (A)    ownership of the Note, any of the other Financing Documents, or any interest therein;

      (B)    any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Agreement, the Note or any of the other Financing Documents, whether or not suit is filed in connection with same, or in connection with Borrower or any Affiliate of Borrower becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding;

      (C)    any failure on the part of Borrower to perform or be in compliance with any of the terms of this Agreement or any of the other Financing Documents;

      (D)    the enforcement by any Indemnified Party of the provisions of this Section 5.1(d);

      (E)    any untrue statement of any material fact contained in any information concerning Borrower or the loans to be made hereunder made by or on behalf of Borrower or the omission or alleged omission to state therein a material fact by any such Person required to be stated in such information or necessary in order to make the statements in such information or in light of the circumstances under which they were made not misleading; or

      (F)    any amounts payable to an Indemnified Party by reason of the application of this Section 5.1(d)(i) shall become due and payable ten (10) business days after demand (which may be made only after the Losses have been incurred).

      (ii)    Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any of the Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Agreement, the Note or any of the other Financing Documents

      (iii)    Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited

17

transaction or the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion in respect of Borrower's plan assets) that the Indemnified Parties may incur, directly or indirectly, as a result of a default under Borrower's covenants with respect to ERISA and employee benefits plans contained herein applicable to Borrower.

(iv)    Promptly after receipt by an Indemnified Party under this Section 5.1(d) of notice of the making of any claim or the commencement of any action, such Indemnified Party shall, if a claim in respect thereof is to be made by such Indemnified Party against Borrower under this Section 5.1(d), notify Borrower in writing, but the omission so to notify Borrower will not relieve Borrower from any liability which it may have to any Indemnified Party under this Section 5.1(d) or otherwise unless and to the extent that Borrower did not otherwise possess knowledge of such claim or action and such failure resulted in the forfeiture by Borrower of substantial rights and defenses or in additional losses.

The provisions of and undertakings and indemnification set forth in this Section 5.1(d) shall survive the satisfaction and payment of the Indebtedness and termination of this Agreement.

(e)    Intentionally Omitted.

(f)    Notice of Default.  Borrower shall promptly advise Lender in writing of any Event of Default or change in Borrower's condition, financial or otherwise, which is reasonably likely to have a Material Adverse Effect.

(g)    Cooperate in Legal Proceedings.  Except with respect to any claim by Borrower against Lender, Borrower shall reasonably cooperate with Lender with respect to any proceedings before any Governmental Authority that are reasonably likely to in any way materially affect the rights of Lender hereunder or any rights obtained by Lender under any of the Financing Documents and, in connection therewith, shall not prohibit Lender, at its election, from participating in any such proceedings.

(h)    Perform Financing Documents.  Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions required to be observed, performed or satisfied by it, and shall pay when due all costs, fees and expenses required to he paid by it, under the Financing Documents.

(i)    Further Assurances.  Borrower shall, at Borrower's sole cost and expense:

(i)    upon Lender's request therefor given from time to time, pay for reports of UCC, tax lien, judgment and bankruptcy searches with respect to Borrower, each such search to be conducted by search firms designated by Lender in each of the locations reasonably· designated by Lender (provided that so long as no Event of Default has occurred, Lender shall not make such request more than one (1) time during any twelve (12) month period);

(ii)    furnish to Lender all instruments, documents, certificates, title and other insurance reports and agreements, and each and every other document, certificate,

agreement and instrument required to be furnished pursuant to the terms of the Financing Documents; and

(iii)   do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Financing Documents, as Lender shall reasonably require from time to time.

(j)   Intentionally Omitted.

(k)   Financial Reporting.  Borrower shall deliver to Lender not later than thirty (30) days after the end of each calendar month, monthly financial statements prepared in accordance with GAAP consistently applied, budget updates and management reports for the immediately preceding month, all in form reasonably acceptable to Lender.  In addition, at the end of each calendar month, Borrower shall deliver to Lender a report ("Net Cash Flow Report") which shall indicate its best estimation of the Net Cash Flow for such month in detail.

(l)   Environmental Events.  To the extent it has knowledge thereof, Borrower will promptly give notice to Lender of any Environmental Claim asserted by any Governmental Authority with respect to any Hazardous Substance on, in, under or emanating from property owned by Borrower, which might involve remediation cost or liability greater than $250,000.

Section 5.2   Borrower Operations: Corporate Solutions Division and Computer Forensic Division.

Borrower shall manage its Corporate Solutions Division and Computer Forensic Division separately, including without limitation, the management of cash, annual revenues, and expenses and shall comply with the following provisions:

(a)   Revenue shall be designated as revenue of the Corporate Solutions Division or the Computer Forensic Division in the following manner:

(i)   Revenue shall be deemed as the revenue of the Corporate Solutions Division if it results from the sale(s) of: (x) product(s) or services to commercial organizations not engaged in e-discovery and forensics consulting services as their primary business; (y) the network enabled product(s); or (z) product(s) or services to federal, state, local or foreign government organizations that are not engaged in law enforcement activity that is performed on the computers that are not owned by the investigating entity or any of its affiliated entities.

(ii)   Revenue shall be deemed as the revenue of the Computer Forensic Division if it is not deemed as the revenue of the Corporate Solutions Division in accordance with paragraph (i) above.

(b)   Annual revenues and cash generated by sales of each of the Corporate Solutions Division and Computer Forensic Division shall be reinvested at the discretion of the applicable division generating such annual revenues and cash.

19

(c)     Each of the Corporate Solutions Division and Computer Forensic Division shall maintain adequate working capital to pay for 90 days of operating expenses. The commitment amounts hereunder may be used for such purposes.

(d)     Each of the Corporate Solutions Division and Computer Forensic Division shall pay such percentage for general and administrative expenses of Borrower which is in direct relation to the percentage of Borrower's full time employees associated with such division.

(e)     Each of the Corporate Solutions Division and Computer Forensic Division shall pay such percentage for customer support related expenses of the Borrower which is in direct relation to the percentage of software maintenance collected by that division.

## ARTICLE VI

## NEGATIVE COVENANTS

Section 6.1    Negative Covenants.    Borrower covenants and agrees that, until payment in full of the Indebtedness, it will not do, directly or indirectly, any of the following unless Lender consents thereto in writing:

(a)     Liens. Incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Lien with respect to Borrower's assets, except Liens in favor of Lender.

(b)     Ownership and Transfer.    Except as expressly permitted by or pursuant to this Agreement or the Financing Documents, permit a direct or indirect Transfer of any interest in Borrower; provided, however, that Transfers of the direct or indirect interests in Borrower shall not violate the foregoing so long as all of the following as satisfied: (i) such Transfer is to an Affiliate of Borrower, and (ii) such Transfers do not, in the reasonable judgment of Lender, have an adverse effect on Lender's interests or rights with respect to interests being transferred.

(c)     Other Borrowings or Investments.    Incur, create, assume, become or be liable in any manner with respect to any Other Borrowings or make, enter into or commit to any investments other than Permitted Investments.

(d)     Sale of Assets, Consolidation, Merger, Dissolution, Etc.    Borrower shall not (and Lender does not authorize Borrower to), directly or indirectly:

(i)     sell, assign, lease, transfer, abandon or otherwise dispose of any of its assets to any other Person except (i) in the ordinary course of Borrower's business consistent with past practice or (ii) dispositions of obsolete or broken equipment and personalty in the ordinary course of Borrower's business consistent with past practice;

(ii)     consolidate with or merge into any person, or permit any other person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all the assets of any other person; or

(iii)     wind up, liquidate or dissolve.

(e)     <u>Change In Business</u>.  Make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

(f)     <u>Debt Cancellation</u>.  Cancel or otherwise forgive or release any material claim or debt owed to Borrower by any Person, except for adequate consideration or in the ordinary course of Borrower's business.

(g)     <u>Affiliate Transactions</u>.  Enter into, or be a party to, any transaction with an Affiliate of Borrower, except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's length transaction with an unrelated third party.

(h)     <u>Misapplication of Funds</u>.  Apply any Moneys received from Lender for a purpose in violation of the provisions of <u>Section 2.8</u> hereof.

(i)     <u>Certain Restrictions</u>.  Enter into any agreement, other than pursuant to the Governing Documents, as in existence on the date hereof, which expressly restricts the ability of Borrower to enter into amendments, modifications or waivers of any of the Financing Documents or to perform its obligations under any Financing Documents.

(j)     <u>Place of Organization</u>.  Change its jurisdiction of organization, creation or formation, as applicable, without giving Lender at least fifteen (15) days' prior written notice thereof and promptly providing Lender such information as Lender may reasonably request in connection therewith.

(k)     <u>Plans and Welfare Plans</u>. (i) Knowingly engage in or permit any transaction in connection with which Borrower could be subject to either a material civil penalty or material tax assessed pursuant to Section 502(i) or 502(1) of ERISA or Section 4975 of the Code, permit any Welfare Plan to provide benefits, including without limitation, medical benefits (whether or not insured), with respect to any former employee of Borrower beyond his or her retirement or other termination of service other than (A) coverage mandated by applicable law, (B) death or disability benefits that have been fully provided for by paid up insurance or otherwise, (C) severance benefits (unless such coverage is provided on the date hereof), or (D) or any coverage provided to current or former employees of Borrower under Welfare Plans in effect on the date hereof, (ii) permit the assets of Borrower to become "plan assets" (as defined in 29 C.F.R. § 2510.3-101) of any "employee benefit plan" (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA, or any "plan" (as defined in Section 4975 of the Code) which is subject to Section 4975 of the Code, or (iii) adopt, materially amend (except as may be required by applicable law) or materially increase the amount of any benefit or amount payable under any Plan or Welfare Plan, except for normal increases in the ordinary course of business consistent with past practice that, in the aggregate, do not result in a material increase in benefits expense to Borrower.

21

## ARTICLE VII
## EVENT OF DEFAULT

Section 7.1    Event of Default.  The occurrence of one or more of the following events shall be an "Event of Default" hereunder:

(i)    if Borrower fails to pay the aggregate amount of outstanding Indebtedness on the Maturity Date;

(ii)    if Borrower fails to comply with the Option requirements and provisions contained herein in Section 2.2 and Section 2.3.

(iii)    if Borrower fails to pay any amount payable pursuant to this Agreement or any other Financing Document other than Indebtedness when due and payable in accordance with the provisions hereof or thereof, as the case may be, and such failure continues for ten (10) business days after Lender delivers written notice thereof to Borrower;

(iv)    if any representation or warranty made herein or in any other Financing Document, or in any report, certificate, other Instrument, agreement or document furnished by Borrower in connection with this Agreement, the Note or any other Financing Document shall be false in any material respect as of the date such representation or warranty was made;

(v)    if Borrower, makes an assignment for the benefit of creditors;

(vi)    if a receiver, liquidator or trustee shall be appointed for Borrower, or if Borrower, shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law applicable to Borrower, shall be filed by or against, consented to, or acquiesced in by, Borrower, or if any proceeding for the dissolution or liquidation of Borrower, shall be instituted;

(vii)    if Borrower attempts to delegate its obligations or assign its rights under this Agreement, any of the other Financing Documents or any interest herein or therein, or if any Transfer occurs other than in accordance with this Agreement and such delegation or assignment of rights or impermissible Transfer continues or is not corrected for ten (10) days after Lender delivers written notice thereof to Borrower;

(viii)    if any provision of the Borrower's organizational documents is amended or modified without the prior written consent of Lender; or if Borrower fails to perform or enforce the provisions of the Borrower's organizational documents and such failure has a Material Adverse Effect or attempts to dissolve or merge Borrower without Lender's consent;

(ix)    if an Event of Default as defined or described in any Financing Document occurs;

22

(x)      if Borrower shall continue to fail to perform any of the terms, covenants or conditions of this Agreement or the other Financing Documents, other than as specifically otherwise referred to in this definition of "Event of Default," for five (5) Business Days after notice to Borrower from Lender, in the case of any default which can be cured by the payment of a sum of money (other than Events of Default pursuant to clauses (i) and (ii) above as to which the grace period, if any, set forth therein is applicable), or for twenty (20) Business Days after notice from Lender or its successors or assigns, in the case of any other default (unless a longer notice period is otherwise provided herein or in such other Financing Document or unless such default cannot be cured within such 20 Business Days, but which cure has commenced during such period, in which case the grace period shall be extended for an additional twenty (20) Business Days); and

(xi)      any money judgment, writ or warrant of attachment or similar process in excess of $75,000 in the aggregate shall be entered or filed against Borrower or any and shall remain unvacated, unbonded or unstayed for a period of 60 days.

then, upon the occurrence of any such Event of Default and at any time thereafter, Lender or its successors or assigns, may, in addition to any other rights or remedies available to it pursuant to this Agreement or the other Financing Documents, or at law or in equity, take such action, without further notice or demand, as Lender or its successors or assigns, deems advisable to protect and enforce its rights against Borrower (including, without limitation, declaring the entire Indebtedness to be immediately due and payable) and may enforce or avail itself of any or all rights or remedies provided in the Financing Documents against Borrower (including, without limitation, in either case, all rights or remedies available at law or in equity).

Section 7.2      Remedies.

Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, other remedies available to Lender against Borrower under this Agreement or under any of the other Financing Documents executed by Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any portion of the Indebtedness shall be declared due and payable, and whether or not Lender shall have commenced other action for the enforcement of its rights and remedies under any of the Financing Documents. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Financing Documents.

Section 7.3      Remedies Cumulative.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Financing Documents executed by or with respect to Borrower or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy,

23

right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of any default or Event of Default shall not be construed to be a waiver of any subsequent default or Event of Default or to impair any remedy, right or power consequent thereon.

Section 7.4   Curative Advances.  If any Event of Default occurs and is not cured by Borrower after notice from Lender, then Lender may expend such sums as it shall reasonably deem appropriate to cure or attempt to cure such Event of Default. Borrower shall immediately repay all such sums so advanced, which sums shall immediately become part of the Indebtedness.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1   Survival.   This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the execution and delivery of this Agreement, the making by Lender of the loans hereunder and the execution and delivery by Borrower to Lender of the Financing Documents, and shall continue in full force and effect so long as any portion of the Indebtedness is outstanding and unpaid. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party. All covenants, promises and agreements in this Agreement contained, by or on behalf of Borrower, shall inure to the benefit of the respective successors and assigns of Lender. Nothing in this Agreement or in any other Financing Document, express or implied, shall give to any Person other than the parties and the holder of the Note and the other Financing Documents, and their legal representatives, successors and permitted assigns, any benefit or any legal or equitable right, remedy or claim hereunder.

Section 8.2   Lender's Discretion.   Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

Section 8.3   Governing Law.

(a)   The proceeds of the Note delivered pursuant hereto were disbursed from New York, which State the parties agree has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects (including, without limitation, matters of construction, validity, and performance), this Agreement and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and performed in such State and any applicable law of the United States of America.

(b)   Any legal suit, action or proceeding against Lender or Borrower arising out of or relating to this Agreement shall be instituted in any federal or state court in New York County, New York. Borrower hereby (i) irrevocably waives, to the fullest extent permitted by applicable

law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum, and (ii) irrevocably submits to the jurisdiction of any such court in any such suit, action or proceeding.

Section 8.4   Modification, Waiver in Writing.   No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or any other Financing Document, or consent or waiver referred to in any Financing Document or consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances

Section 8.5   Delay Not a Waiver.   Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Financing Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Financing Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Financing Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 8.6   Notices.   All notices, consents, approvals and requests required or permitted hereunder or under any other Financing Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, and by facsimile transmission, addressed if to Lender, at 21 Whitesands, Newport Coast, CA 92657, Attention: Mr. Timothy Leehealey, with a copy to: Kleinberg, Kaplan, Wolff & Cohen, P.C., 551 Fifth Avenue, New York, New York 10176, Attention: Lawrence D. Hui, Esq., and if to Borrower at 384 South 400 West, Suite 200, Lindon, UT  84042, Attention: Kent Millington with a copy to Dorsey & Whitney, LLP, 170 South Main Street, Suite 900, Salt Lake City, Utah  84010, Attention: Nolan S. Taylor, Esq., or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section 8.6. A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or two Business Days after mailing; or in the case of expedited prepaid delivery and facsimile transmission, on the Business Day after the same was sent. A party receiving a notice which does not comply with the technical requirements for notice under this Section 8.6 may elect to waive any deficiencies and treat the notice as having been properly given.

Section 8.7   Trial By Jury.   EACH OF BORROWER AND LENDER, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING, INCLUDING, WITHOUT LIMITATION, ANY TORT

ACTION, BROUGHT BY EITHER PARTY HERETO WITH RESPECT TO THIS AGREEMENT, THE NOTE OR THE OTHER FINANCING DOCUMENTS.

Section 8.8    Headings.  The Article and Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 8.9    Assignment.  Borrower may not sell, assign or transfer any interest in the Financing Documents, or any portion of any of the foregoing (including, without limitation, Borrower's rights, title, interests, remedies, powers and duties hereunder and thereunder) without Lender's prior written consent.  Lender shall have the right to assign this Agreement and/or its interest in any of the other Financing Documents and the obligations hereunder to one or more Affiliates of the Lender.  In the event of an assignment by Lender: (i) the assignee shall have, to the extent of such assignment, the same rights, benefits and obligations as it would have if it were an original "Lender" hereunder; (ii) the assignee shall be deemed for all purposes to be a "Lender" hereunder; and (iii) upon any such substitution of Lender, a replacement or addition "Lender signature page" shall be executed by the new Lender and attached to this Agreement and thereupon become a part of this Agreement.  Borrower agrees to cooperate in all reasonable respects in connection with such sale, assignment or participation.  After the effectiveness of any assignment or participation, the new Lender shall provide notice to Borrower of the identity, address and other pertinent information pertaining to the new Lender.  Notwithstanding anything in this Agreement to the contrary, after an assignment by any Lender, the "Lender" (prior to such Assignment) shall continue to have the benefits of any rights or indemnifications and shall continue to have the obligations contained herein which such Lender had during the period such party was a "Lender" hereunder.

Section 8.10    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 8.11    Preferences.  Lender shall have no obligation to marshal any assets in favor of Borrower or any other party or against or in payment of any or all of the obligations of Borrower pursuant to this Agreement or any other Financing Document.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder, provided that such application or reapplication is performed by Lender in accordance with the terms of this Agreement or any other applicable Financing Document.  To the extent Borrower makes a payment or payments to Lender for Borrower's benefit, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or pan thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 8.12   Waiver of Notice.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or another Financing Document specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice except for notices required by applicable Legal Requirements, Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Financing Documents does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 8.13   Failure to Consent.  If Borrower shall seek the approval by or consent of Lender hereunder or under the Note, or any of the other Financing Documents and Lender shall fail or refuse to give such consent or approval, then so long as Lender has acted in good faith Borrower shall not be entitled to any damages for any withholding or delay of such approval or consent by Lender, it being intended that so long as Lender has acted in good faith Borrower's sole remedy shall be to bring an action for an injunction or specific performance, which remedy for injunction or specific performance shall be available only in those cases where Lender has expressly agreed hereunder or under any of the other Financing Documents not to unreasonably withhold or delay its consent or approval.

Section 8.14   Offsets, Counterclaims and Defenses.  Any assignee of Lender's interest in and to this Agreement and the other Financing Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to this Agreement and the other Financing Documents which Borrower may otherwise have against any assignor or this Agreement and the other Financing Documents.  No such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon this Agreement or upon any other Financing Document.  Any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 8.15   No Joint Venture or Partnership.  Borrower and Lender intend that the relationship created hereunder be solely that of borrower and lender.  Nothing herein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender.

Section 8.16   Waiver of Marshalling of Assets Defense.  To the fullest extent Borrower may legally do so, Borrower waives all rights to a marshalling of the assets of Borrower and others with interests in Borrower, or to a sale in inverse order of alienation in the event of foreclosure of the interests hereby created, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Financing Documents.

Section 8.17   Waiver of Counterclaim.  To the extent permitted by applicable Legal Requirements, Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim (or other counterclaim that Borrower would lose as a result of the

27

application of any statute of limitation or the doctrine of waiver or laches if such counterclaim is not asserted at the time), in any action or proceeding brought against it by Lender or its agents.

Section 8.18   Conflict; Construction of Documents.   In the event of any conflict between the provisions of this Agreement and the provisions of any of the other Financing Documents, the provisions of this Agreement shall prevail. The parties hereto acknowledge that they were represented by counsel in connection with the negotiation and drafting of the Financing Documents and that the Financing Documents shall not be subject to the principle of construing their meaning against the party which drafted same.

Section 8.19   Brokers and Financial Advisors.   Borrower and Lender hereby represent that they have dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower and Lender hereby agree to indemnify and hold the other harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of the indemnifying party in connection with the transactions contemplated herein. The provisions of this Section 8.19 shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

Section 8.20   Counterparts.   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

Section 8.21   Estoppel Certificates.   Borrower agrees at any time and from time to time upon not less than fifteen (15) days prior written notice by Lender to execute, acknowledge and deliver to the party specified in such notice, a statement, in writing, certifying that this Agreement and the Financing Documents are unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications hereto), and stating whether or not, to the best knowledge of Borrower, any default or Event of Default has occurred and is then continuing, and, if so, specifying each such default or Event of Default.

## ARTICLE IX

## BANKRUPTCY

Section 9.1   Material Inducement.   Borrower acknowledges and agrees that the representations, warranties, covenants and agreements contained in this Article IX constitute a material inducement to Lender to enter into this Agreement, the other Financing Documents and the transactions contemplated hereby and thereby and that without the inclusion of this Article IX herein Lender would not have entered into this Agreement and the other Financing Documents.

Section 9.2   No Fraudulent Intent.   Borrower acknowledges, warrants, represents and agrees that neither the execution and delivery of this Agreement and the other Financing Documents nor the performance of any actions required hereunder or thereunder is being consummated by Borrower or any other Person with or as a result of any actual intent by such

28

Persons, or any of them, to hinder, delay or defraud any entity to which such Persons, or any of them, are now or will hereafter become Indebted.

Section 9.3   <u>No Bankruptcy Intent</u>. Borrower represents, covenants and agrees that Borrower does not have any intent (a) to file any voluntary petition in bankruptcy under any Chapter of the Bankruptcy Code or in any manner to seek relief, protection, reorganization, liquidation, dissolution or similar relief for debtors under any local, state, federal or other insolvency laws or laws providing for relief of debtors, or in equity, or directly or indirectly to cause any other Person to file any such petition or to seek any such relief, either at the present time, or at any time hereafter, or (b) directly or indirectly to cause any involuntary petition under any Chapter of the Bankruptcy Code to be filed against Borrower or directly or indirectly to cause Borrower to become the subject of any dissolution, liquidation or insolvency proceeding or any other proceeding pursuant to any local, state, federal, or other insolvency laws or laws providing for relief of debtors, either at the present time, or at any time hereafter.

Section 9.4   <u>Agreement in Best Interests of Parties, Consideration</u>.   Borrower acknowledges and agrees that the transactions evidenced by this Agreement and the other Financing Documents are in its best interests.

*[signature page follows]*

29

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**LENDER:**

**LAMASSU CAPITAL, L.P.**

By: _____

Timothy Leehealy,
its general partner

_____

**BORROWER:**

**ACCESSDATA CORP.**

By: _____

Name:  Kent Millington
Title:  President and CEO

Loan Agreement Signature Page

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**LENDER:**

**LAMASSU CAPITAL, L.P.**

By: _____
    Timothy Leehealy,
    its general partner

_____

**BORROWER:**

**ACCESSDATA CORP.**

By: _____
    Name: Kent Millington
    Title: President and CEO

Loan Agreement Signature Page

<u>**SCHEDULE I**</u>

<u>**Right to Draw Additional Portion**</u>

Borrower may draw amounts of the Additional Portion only if:

(i)    <u>Absence of Defaults</u>. There shall not be any monetary or other Events of Default then continuing under the Loan Agreement or after giving effect to the draw of such amount of the Additional Portion;

(ii)    <u>Representations and Warranties</u>. The representations and warranties in the Agreement and in the other Financing Documents shall be true and correct in all respects.

(iii)    <u>Formation Documents</u>. Lender shall have received Borrower's articles of incorporation, as amended, modified or supplemented to the draw date, as filed with the Secretary of State in the jurisdiction of organization and in effect on the draw date and certified to be true, correct and complete by the appropriate Secretary of State as of a date not more than thirty (30) days prior to the draw date, together with a good standing certificate from such Secretary of State and a good standing certificate from the Secretaries of State (or the equivalent thereof) of each other State in which Borrower is required to be qualified to transact business.

(iv)    <u>Certified Organizational Agreement and Resolutions, Etc.</u>  Lender shall have received a certificate from Borrower, dated as of the draw date, certifying (i) the names and true signatures of its incumbent officers authorized to sign the Financing Documents to which Borrower is a party; (ii) that the organizational documents of Borrower, attached to the certificate are in effect on the draw date, and have not been modified since the date of its execution; and (iii) that the resolutions of Borrower, attached to the certificate approving and authorizing the execution, delivery and performance of the Financing Documents to which Borrower is a party are in effect as of the draw date and that they are all resolutions of Borrower relating to the Financing Documents.

(v)    <u>Additional Matters</u>.  Lender shall have received such other certificates, opinions, documents and instruments relating to the loans to be made hereunder as may have been reasonably requested by Lender and reasonably satisfactory in form and substance to Lender (and Lender's counsel).


Further, In the event of draw-down of any amount of the Additional Portion by Borrower in accordance with the terms hereof, funds will be provided by Lender upon delivery by Borrower of a written request of borrowing upon a 10-day prior written notice in the form annexed as Schedule II hereto.

### *Initial Portion – Use of Proceeds and Triggers*

Borrower may draw up to Five Million Eight Hundred and Sixty Nine Thousand Eight Hundred and Three and 94/100 Dollars ($5,869,803.94) of the Initial Portion in multiple draws and in accordance with the use of proceeds provisions set forth below:

1)      For Borrower's Corporate Solutions Division

The commitment amount of up to Three Million and 00/100 Dollars ($3,000,000.00).

Use of Proceeds: The proceeds of such commitment amount may be used solely as directed by T. Leehealey in his sole discretion.

2)      For Borrower's Computer Forensics Division

The commitment amount of up to Two Million Eight Hundred and Sixty Nine Thousand Eight Hundred and Three and 94/100 Dollars ($2,869,803.94).

Use of Proceeds: The proceeds of such commitment amount shall be used solely as directed by Eric Thompson; provided, however, that any amount hereunder can only be drawn if the amount of working capital of Borrower's Computer Forensics Division falls below the amount required to cover sixty (60) days of Computer Forensics Division's operating expenses, and provided further that any amount drawn hereunder may not exceed the amount required to restore the working capital of Borrower's Computer Forensics Division to the amount required to cover ninety (90) days of Computer Forensic Division's operating expenses. This amount can be increased only by T. Leehealey in his sole discretion.

### *Second Portion – Use of Proceeds and Triggers*

Borrower may draw up to Four Million Five Hundred and Ninety Five Thousand and Six Hundred and Ninety Seven and 06/100 Dollars ($4,595,697.06) of the Second Portion in multiple draws only upon the following terms and conditions and in accordance with the use of proceeds provisions set forth below:

1)      For Borrower's Corporate Solutions Division

The commitment amount of up to Three Million and 00/100 Dollars ($3,000,000.00) may be drawn upon solely under the following conditions:

- By T. Leehealey, in his sole discretion

- By Borrower, only if Borrower's trailing 6-months revenues equal $12,000,000.00 or above

2

- By Borrower, upon Borrower's failure, by June 30, 2008, to release a multi-node network enabled forensic product.

Use of Proceeds: The proceeds of such commitment amount may be used solely as directed by T. Leehealey in his sole discretion.

2)      For Borrower's Computer Forensic Division

The commitment amount of up to One Million Five Hundred and Ninety Five Thousand Six Hundred and Ninety Seven and 06/100 Dollars ($1,595,697.06) may be drawn upon solely under the following conditions:

- By T. Leehealey, in his sole discretion

- By Borrower, only if Borrower's trailing 6-months revenues equal $12,000,000.00 or above or

- By Borrower, only if Computer Forensics Division' trailing 6-months revenues equal $10,000,000 or above or

- By Borrower, only if Borrower lowers the strike price for Borrower's shares of common stock relating to Lender's option to convert any applicable Loan Amount into Common Stock to the amount equal to Borrower's (4.5 x trailing 12-month revenue + net working capital + cash associated with the exercising of options) divided by (all outstanding shares + shares underlying all outstanding vested and unvested options).

Use of Proceeds: The proceeds of such commitment amount may be used solely as directed by Eric Thompson, provided, however, that any amount hereunder can only be drawn if the amount of working capital of Borrower's Computer Forensics Division falls below the amount required to cover sixty (60) days of Computer Forensics Division's operating expenses, and provided further that any amount drawn hereunder may not exceed the amount required to restore the working capital of Borrower's Computer Forensics Division to the amount required to cover ninety (90) days of Computer Forensic Division's operating expenses.   This amount can be increased only by T. Leehealey in his sole discretion

### *Third Portion – Use of Proceeds and Triggers*

Borrower may draw Eight Million Three Hundred and Sixty Six Thousand Seven Hundred and Ninety Six and 32/100 Dollars ($8,366,796.32) of the Third Portion in multiple draws upon the following terms and conditions and in accordance with the use of proceeds provisions set forth below:

1)      For Borrower's Corporate Solutions Division

3

The commitment amount of up to Five Million Two Hundred and Eighty Thousand and 00/100 Dollars may be drawn upon solely under the following conditions:

- By T. Leehealey, in his sole discretion

- By Borrower, upon Borrower's failure, by June 30, 2009, to release a multi-node network enabled forensic product and an e-discovery suite capable of performing network enabled enterprise wise search and collection on windows desktop machines.

Use of Proceeds: The proceeds of such commitment amount may be used solely as directed by T. Leehealey in his sole discretion.

2)    For Borrower's Computer Forensic Division

The commitment amount of up to Three Million Three Hundred and Sixty Six Thousand Seven Hundred and Ninety Six and 32/100 Dollars ($3,366,796.32) may be drawn upon solely under the following conditions:

- By T. Leehealey, in his sole discretion

- By Borrower, only if Borrower's trailing 6-months revenues equal $19,000,000.00 or above or

- By Borrower, only if Computer Forensics Division' trailing 6-months revenues equal $15,000,000 or above or

- By Borrower, only if Borrower lowers the strike price for Borrower's shares of common stock relating to Lender's option to convert any applicable Loan Amounts into Common Stock to the amount equal to Borrower's (4.5 x trailing 12-month revenue + net working capital + cash associated with the exercising of options) divided by (all outstanding shares + shares underlying all outstanding vested and unvested options);

Use of Proceeds: The proceeds of such commitment amount may be used solely as directed by Eric Thompson, provided, however, that any amount hereunder can only be drawn if the amount of working capital of Borrower's Computer Forensics Division falls below the amount required to cover sixty (60) days of Computer Forensics Division's operating expenses, and provided further that any amount drawn hereunder may not exceed the amount required to restore the working capital of Borrower's Computer Forensics Division to the amount required to cover ninety (90) days of Computer Forensic Division's operating expenses.  This amount can be increased only by T. Leehealey in his sole discretion

4

SCHEDULE II

## [FORM OF NOTICE OF BORROWING]

## [ACCESSDATA CORP. LETTERHEAD]

### [Date]

To: [Lender under the Loan Agreement]:

RE:    Notice of Borrowing

Gentlemen:

Reference is made to a Loan Agreement, dated July 30, 2007, (the "Loan Agreement") by and between you ("Lender") and   AccessData Corp. ("Borrower").   All terms which are capitalized herein and which are defined in the Loan Agreement shall have the same meaning when used herein as are ascribed to them in the Loan Agreement.

Pursuant to Section 2.1 of the Loan Agreement you are hereby given this notice of borrowing (a "Notice of Borrowing") that Borrower requests that Initial/Second/Third Portion in the aggregate principal amount of $_____, (the "Draw Amount") be made on _____ __, 200_ [at least 10-day notice is required] (the "Drawdown Date").

(a)       Enclosed herewith are:  a Certificate of the Chief Executive Officer and the Chief Financial Officer of Borrower certifying to (i) the relevant requirements set forth in Schedule I of the Loan Agreement being met, (ii) the compliance by Borrower with the terms and provisions contained in the Loan Agreement and the Financing Documents, (iii) the absence of defaults in connection with the Loan Agreement and Financing Documents, (iv) the fact that if the Draw Amount requested herein is funded, the Initial Portion, Second Portion or Third Portion, as applicable, will not be exceeded, and (v) litigation matters, to the best of their knowledge after due inquiry, and as to compliance with law.

The Draw Amount is requested to be made for the account of Borrower on the Drawdown Date by wire transfer to the account of Borrower in accordance with the following transfer instructions:

Wire transfer to: [                    ]

Very truly yours,

ACCESSDATA CORP.

By: _____

Name:
Title:

Schedule 2.3(b)

## Granted and Outstanding Stock Options

[SCHEDULE PROVIDED IN A SEPARATE ATTACHMENT]

2

Schedule 3.1(e)

## Material Agreements

- AccessData Reseller Agreement between the Company and Lyme Computer Systems, Inc., dated June 8, 2007

- AccessData Corporation 2001 Stock Plan

- AccessData Corporation 2007 Stock Plan

- Lease Agreement between EsNet Properties, L.C. and the Company, dated October 1, 2004, as amended by the First Amendment to Lease Agreement, dated June 29, 2006

- Employment Offer Letter between the Company and J. Kent Millington, dated January 4, 2007

- Employment Offer Letter between the Company and Richard A. Russell, dated November 13, 2006

- Employment Offer Letter between the Company and Omar Leeman, dated April 12, 2006

3

## UNSECURED PROMISSORY NOTE

### EXHIBIT A

$18,832,297                                                                      July 30, 2007

FOR VALUE RECEIVED, the undersigned, ACCESSDATA CORP., a Delaware corporation ("Borrower"), hereby unconditionally promises to pay the order of LAMASSU CAPITAL, L.P., a Delaware limited partnership ("Lender"), the principal sum of EIGHTEEN MILLION EIGHT HUNDRED AND THIRTY-TWO THOUSAND TWO HUNDRED AND NINETY-SEVEN UNITED STATES DOLLARS ($18,832,297), or such lesser amount of Indebtedness (as defined in the Loan Agreement as hereinafter defined) outstanding under the Loan Agreement, dated as of the date hereof, by and between Borrower and Lender (the "Loan Agreement") when and as such payments are due in accordance with the terms of the Loan Agreement. All payments of principal hereunder shall be paid in lawful money of the United States at the office of Lender provided in the Loan Agreement.

This Unsecured Promissory Note evidences Borrower's Indebtedness (as defined in the Loan Agreement) to Lender under the Loan Agreement. This Unsecured Promissory Note is referred to in, and issued pursuant to, the terms of the Loan Agreement. The Loan Agreement, contains, among other things, provisions for conversion by Lender of any and all amounts of the Loan Amount (as defined in the Loan Agreement) into common stock of Borrower, upon the terms and conditions specified therein. The amount payable by Borrower hereunder shall be reduced, on a dollar-for-dollar basis by any amount of the Loan Amount (as defined in the Loan Agreement) converted by Lender into Borrower's common stock pursuant to the terms and conditions set forth in the Loan Agreement.

The outstanding principal balance of the Loan Amount shall bear interest at a rate of zero percent (0%).

The failure or delay by Lender or the holder hereof to exercise any right, power or remedy under this Unsecured Promissory Note or with respect to the indebtedness evidenced hereby shall not operate as a waiver thereof, nor shall the exercise of any single or partial right, power or remedy preclude any other or further exercise of the same or any other right, power or remedy.

Borrower hereby waives presentment, demand, notice, protest or other action of any kind with respect to its obligations under this Unsecured Promissory Note.

This Unsecured Promissory Note shall be governed by and construed in accordance with the internal laws of the State of New York.

ACCESSDATA CORP.

By: _____
      Name: Kent Millington
      Title: President and CEO

**EXECUTION COPY**

## FIRST AMENDMENT TO LOAN AGREEMENT

This FIRST AMENDMENT TO LOAN AGREEMENT (this "Amendment") is made as of the 25th day of September, 2007, by and between LAMASSU CAPITAL, L.P., a Delaware limited partnership, as lender ("Lender") and ACCESSDATA CORP., a Utah corporation, as borrower ("Borrower").

## W I T N E S S E T H:

WHEREAS, Lender and Borrower entered into that certain Loan Agreement as of July 30, 2007 (the "Loan Agreement"), in connection with the loan to Borrower in aggregate principal amount not to exceed Eighteen Million Eight Hundred and Thirty-Two Thousand and Two Hundred and Ninety Seven and 00/100 Dollars ($18,832,297.00); and

WHEREAS, the Lender and the Borrower each desire to amend the Loan Agreement to modify certain provisions of Schedule I to the Loan Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and covenants contained herein and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Generally. All capitalized terms used but not defined herein shall have the respective meanings given thereto in the Loan Agreement.

2.    Effective as of the date hereof, the Loan Agreement is amended as follows:

(a)    Schedule I, the fourth bullet in subsection 2) of each of the section titled "Second Portion – Use of Proceeds and Triggers" and the section titled "Third Portion – Use of Proceeds and Triggers" is amended and restated in its entirety to read as follows:

"•    By Borrower, only if Borrower lowers the strike price for Borrower's shares of common stock relating to Lender's option to convert any applicable Loan Amount into Common Stock to the amount equal to Borrower's (2.25 x trailing 12-month revenue + net working capital + cash associated with the exercising of options) divided by (all outstanding shares + shares underlying all outstanding vested and unvested options)."

3.    Confirmation. As modified, supplemented and amended by this Amendment, each of the terms, covenants and conditions of the Loan Agreement and the Note are hereby ratified and confirmed and shall continue to be and remain in full force and effect in accordance with their respective terms. Nothing contained in this Amendment shall affect Lender's or Borrower's rights and remedies under the Loan Agreement and the Note. The execution, delivery and performance of this Amendment shall not, except as expressly provided

herein, constitute a waiver of any provision of, or operate as a waiver of any right, power or remedy of Lender or Borrower under the Loan Agreement or the Note.

        4.     <u>Governing Law</u>.  This Amendment shall be governed by and construed in accordance with the laws of the State of New York.

        5.     <u>Costs</u>.  Borrower shall pay all of the costs and expenses of Lender arising from the negotiation and entering into of this Amendment.

        6.     <u>Counterparts</u>.  This Amendment may be executed in multiple counterparts, each of which will be deemed to be an original and all of which, together, will constitute one and the same document; signatures delivered by facsimile and email shall be enforceable.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement by their duly-authorized representatives, all as of the day and year first above written.

LENDER:

LAMASSU CAPITAL, L.P.

By: _____
Name: Timothy Lochenbay,
its general partner

BORROWER:

ACCESSDATA CORP.

By: _____
Name: Ken Millington
Title: President and CEO

# EXHIBIT C

EXECUTION COPY

STOCK PURCHASE AGREEMENT

by and among

ERIC THOMPSON,

BETTY THOMPSON,

BB AND B UNITRUST
u/a/d 7/11/07

SLICK ROCK CANYON UNITRUST
u/a/d 7/11/07, and

CLEAR CREEK CANYON, L.C., as Sellers

and

LAMASSU CAPITAL, L.P., as Purchaser

dated as of

July 30, 2007

# TABLE OF CONTENTS

Page #

ARTICLE I   PURCHASE AND SALE OF SHARES ................................................................2
    Section 1.1    Sale and Transfer of Common Shares ...............................................2
    Section 1.2    The Purchase Price.............................................................................3
    Section 1.3    Adjustment for Change in the Company's Common Stock.................3

ARTICLE II   THE CLOSING ...............................................................................................4
    Section 2.1    The Closing..........................................................................................4
    Section 2.2    Deliveries by Sellers ..........................................................................4
    Section 2.3    Deliveries by Purchaser .....................................................................5

ARTICLE III  REPRESENTATIONS AND WARRANTIES OF SELLERS............................5
    Section 3.1    Authorization; Validity of Agreement ...............................................6
    Section 3.2    Execution; Validity of Agreement .....................................................6
    Section 3.3    Consents and Approvals; No Violations.............................................6
    Section 3.4    Ownership and Possession of Common Shares...................................6
    Section 3.5    Good Title Conveyed..........................................................................6
    Section 3.6    Legal Proceedings..............................................................................7
    Section 3.7    Company Action .................................................................................7
    Section 3.8    Compliance with Laws .......................................................................7
    Section 3.9    Brokers or Finders..............................................................................7

ARTICLE IV  REPRESENTATIONS AND WARRANTIES OF PURCHASER........................7
    Section 4.1    Organization.........................................................................................7
    Section 4.2    Authorization; Validity of Agreement ...............................................7
    Section 4.3    Consents and Approvals; No Violations.............................................8
    Section 4.4    Acquisition of Common Shares for Investment; Ability to Evaluate
                 and Bear Risk......................................................................................8
    Section 4.5    Availability of Funds ..........................................................................8
    Section 4.6    Litigation.............................................................................................8
    Section 4.7    Brokers or Finders..............................................................................9

ARTICLE V  COVENANTS ...................................................................................................9
    Section 5.1    Interim Operations of the Company ...................................................9
    Section 5.2    Access; Confidentiality ......................................................................10
    Section 5.3    Efforts and Actions to Cause Closing to Occur .................................10
    Section 5.4    Tax Matters.........................................................................................10
    Section 5.5    Common Shares..................................................................................10

ARTICLE VI  CONDITIONS ................................................................................................11
    Section 6.1    Conditions to Each Party's Obligation to Effect Each Closing ................11
    Section 6.2    Conditions to Obligations of Purchaser to Effect Initial Closing
                 and Each Closing ................................................................................11
    Section 6.3    Conditions to Obligations of Seller to Effect Each Closing .....................12

ii

ARTICLE VII TERMINATION ............................................................................12
    Section 7.1    Termination.....................................................................12
    Section 7.2    Effect of Termination....................................................13

ARTICLE VIII INDEMNIFICATION ..................................................................13
    Section 8.1    Indemnification; Remedies. ...........................................13
    Section 8.2    Notice of Claim; Defense...............................................14
    Section 8.3    No Duplication; Sole Remedy Procedures ....................14

ARTICLE IX  DEFINITIONS AND INTERPRETATION .........................................15
    Section 9.1    Definitions......................................................................15
    Section 9.2    Interpretation..................................................................18

ARTICLE X   MISCELLANEOUS .......................................................................18
    Section 10.1    Fees and Expenses .......................................................18
    Section 10.2    Amendment and Modification .....................................19
    Section 10.3    Notices ........................................................................19
    Section 10.4    Counterparts.................................................................20
    Section 10.5    Entire Agreement; No Third Party Beneficiaries........20
    Section 10.6    Severability .................................................................20
    Section 10.7    Governing Law ............................................................20
    Section 10.8    Venue .........................................................................21
    Section 10.9    Extension; Waiver........................................................21
    Section 10.10 Assignment ................................................................21

Schedule I – Sellers' Common Share Ownership

**EXECUTION COPY**

## STOCK PURCHASE AGREEMENT

Stock Purchase Agreement, dated as of July 30, 2007, by and among LAMASSU CAPITAL, L.P., a Delaware limited partnership, BETTY THOMPSON, an individual residing at 11361 Orangeview Rd., Santa Ana, CA 92705, ERIC THOMPSON, an individual residing at 7188 Ox Bow Circle, Tallahassee, Florida 32312, BB AND B UNITRUST u/a/d 7/11/07, and SLICK ROCK CANYON UNITRUST u/a/d 7/11/07 and CLEAR CREEK CANYON, L.C., a Nevada limited liability company. *Capitalized terms used in this Agreement have the meanings assigned to them in Article IX.*

WHEREAS, Eric Thompson is the founder of the Company and Eric Thompson and/or Eric Trust, of which Eric Thompson is the sole trustee, own certain number of the issued and outstanding Common Shares, 268,000 of which are subject to this Agreement;

WHEREAS, Betty Thompson is a stockholder of the Company and Betty Thompson and/or Betty Trust, a trust of which Betty Thompson is a sole trustee, own certain number of the issued and outstanding Common Shares, 162,500 of which are subject to this Agreement.

WHEREAS, Clear Creek is a stockholder of the Company and owns certain number of the issued and outstanding Common Shares, 1,144,500 of which are subject to this Agreement;

WHEREAS, Purchaser has agreed to provide a loan to the Company upon the terms and conditions contained in that certain Loan Agreement;

WHEREAS, immediately prior to the execution hereof, Purchaser, the Company and Company's stockholders entered into that certain Investor Rights Agreement, to set forth the parties' agreement with respect to the Company's governance and certain voting rights of Purchaser and other matters described therein;

WHEREAS, Purchaser and Sellers deem it advisable and in the best interests of Purchaser and each Seller, respectively, to enter into the Transactions to be effected upon the terms and subject to the conditions set forth herein; and

WHEREAS, Sellers hereby grant to Purchaser an unconditional, irrevocable option to purchase, subject to and in accordance with the terms hereof, up to 1,575,000 fully paid and non-assessable Common Shares; and

WHEREAS, Purchaser hereby agrees to purchase from Sellers such Common Shares, at Seller's option, in the event certain conditions contained herein are satisfied;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF SHARES

Section 1.1   Sale and Transfer of Common Shares.  Subject to the terms and conditions of this Agreement, at the relevant Closing, Seller or Sellers, as applicable, shall sell, convey, assign, transfer and deliver to Purchaser the number of issued and outstanding Common Shares, free and clear of all Encumbrances as follows:

(a)   *Initial Purchase* – In the Initial Purchase, Purchaser shall purchase from Eric Thompson and/or Eric Trust 130,000 Common Shares and from Betty Thompson and/or Betty Trust 85,000 Common Shares, and from Clear Creek 635,000, in each case at the price of $1.99 per Common Share.

(b)   *Second Purchase* – In the Second Purchase, if either:

(i)   Purchaser elects to proceed with the Second Purchase, in its sole discretion, and provides Sellers with a 3-Business Day prior written notice in accordance with Section 10.3 hereof; or

(ii)   Eric Thompson elects to proceed with the Second Purchase and (x) the Company's trailing 6-months revenues equal $12,000,000 or more or (y) the Company failed to release by June 30, 2008, a multi-node network enabled forensic product or (z) if the Company's Computer Forensics Division's trailing 6-months revenues equal $10,000,000 or more or (w) Eric Thompson lowers the price per Common Share to the amount equal to (4.5 x trailing 12-month revenue + net working capital + cash associated with exercising of options) divided by (all outstanding shares + shares underlying all outstanding vested and unvested options)

then Purchaser shall purchase from Eric Thompson and/or Eric Trust 75,000 Common Shares; from Betty Thompson and/or Betty Trust 40,000 Common Shares and from Clear Creek 235,000 Common Shares, in each case, at the price of $3.12 per Common Share or such lower price as may apply if Eric Thompson lowers the price pursuant to Section 1.1(b)(ii)(w) above.

(c)   *Third Purchase* – In the Third Purchase, if either:

(i)   Purchaser elects to proceed with the Third Purchase, in its sole discretion, and provides Seller with a 3-Business Day prior written notice in accordance with Section 10.3 hereof; or

(ii)   Eric Thompson elects to proceed with the Third Purchase and (x) the Company's trailing 6-months revenues equal $19,000,000 or more or (y) the Company failed to release by June 30, 2009, a multi-node network enabled forensic product and an e-discovery suite capable of performing network enabled enterprise wise search and collection on windows desktop machines or (z) if the Company's Computer Forensics Division's trailing 6-months revenues equal

2

$15,000,000 or more or (w) Seller lowers the price per Common Share to the amount equal to (4.5 x trailing 12-month revenue + net working capital + cash associated with exercising of options) divided by (all outstanding shares + shares underlying all outstanding vested and unvested options)

then Purchaser shall purchase from Eric Thompson and/or Eric Trust 63,000 Common Shares, from Betty Thompson and/or Betty Trust 37,500 Common Shares, and from Clear Creek 274,500 Common Shares, in each case at the price of $4.18 per Common Share.

Section 1.2    The Purchase Price.    Subject to the terms and conditions of this Agreement, in consideration of the aforesaid sale, conveyance, assignment, transfer and delivery to Purchaser of the Common Shares, Purchaser shall pay to the applicable Sellers, an amount of cash as follows:

(a)    $1,691,500.00 in the aggregate for the Initial Purchase, with an amount paid to each Seller that is equal to the number of Common Shares sold by such Seller in the Initial Purchase multiplied by $1.99;

(b)    $1,092,000.00 in the aggregate for the Second Purchase, with an amount paid to each Seller that is equal to the number of Common Shares sold by such Seller in the Second Purchase multiplied by $3.12 or, in the event of adjustment of the $3.12 amount pursuant to Section 1.1(b)(ii)(w), amounts equal to the number of Common Shares sold multiplied by such adjusted amount; and

(c)    $1,567,500.00 in the aggregate for the Third Purchase, with an amount of cash paid to each Seller that is equal to the number of Common Shares sold by such Seller in the Third Purchase multiplied by $4.18 or, in the event of adjustment of the $4.18 amount pursuant to Section 1.1(c)(w), amounts equal to the number of Common Shares sold multiplied by such adjusted amount.

Section 1.3    Adjustment for Change in the Company's Common Stock.

(a)    If, after the date hereof and with respect to any unpurchased Common Shares subject to this Agreement, the Company:

(i)    makes a distribution on Common Stock in additional shares of Common Stock;

(ii)    subdivides outstanding shares of Common Stock into a greater number of shares of Common Stock;

(iii)    combines outstanding shares of Common Stock into a smaller number of shares of Common Stock; or

(iv)    issues additional shares of Common Stock or consummates any transaction that would result in dilution of Purchaser's potential ownership of the Company's equity upon the closing of the purchases hereunder,

3

then the number of shares of Common Stock to be purchased by Purchaser hereunder shall be adjusted so that Purchaser may receive the same proportion number of the total number of shares of Common Stock which it would have owned if Purchaser purchased such shares of Common Stock immediately prior to such Company action.

The adjustment shall become effective immediately after the record date in the case of a distribution and immediately after the effective date in the case of a subdivision or combination.

Such adjustment shall be made successively whenever any event listed above shall occur.

## ARTICLE II

## THE CLOSING

Section 2.1    The Closing.

(a) *Initial Purchase Closing.* The sale and transfer of the Initial Purchase Shares by Seller to Purchaser pursuant to this Agreement shall take place at the offices of Kleinberg, Kaplan Wolff & Cohen, P.C., 551 Fifth Avenue, New York, New York 10176 at 10:00 a.m., New York city time, five Business Days following the satisfaction and/or waiver of all conditions to close set forth in Article VI (other than conditions which can be satisfied only by the delivery of certificates, opinions or other documents at the Initial Purchase Closing), unless another date, place and/or manner of closing is agreed in writing by each of the parties hereto.

(b)    *Second Purchase Closing.*  The sale and transfer of the Second Purchase Shares by Seller to Purchaser shall take place at the offices of Kleinberg, Kaplan, Wolff & Cohen, P.C., 551 Fifth Avenue, New York, New York, 10176 at 10:00 a.m. New York City time, five Business Days following the satisfaction and/or waiver of all conditions to close set forth in Article VI (other than conditions that can be satisfied only by the delivery of certificates, opinions or other documents at the Second Purchase Closing), unless another date, place and/or manner of closing is agreed in writing by each of the parties hereto.

(c)    *Third Purchase Closing.*  The sale and transfer of the Third Purchase Shares by Seller to Purchaser shall take place at the offices of Kleinberg, Kaplan, Wolff & Cohen, P.C., 551 Fifth Avenue, New York, New York, 10176 at 10:00 a.m. New York City time, five Business Days following the satisfaction and/or waiver of all conditions to close set forth in Article VI (other than conditions that can be satisfied only by the delivery of certificates, opinions or other documents at the Third Purchase Closing), unless another date, place and/or manner of closing is agreed in writing by each of the parties hereto.

Section 2.2    Deliveries by Sellers.

(a)    At the Initial Closing, the Seller shall deliver to Purchaser the signature pages to the Investor Rights Agreement executed by the Stockholders (as such term is defined in the Investor Rights Agreement) and the Company and all the documents set forth in subsection (b) below.

4

(b)     At each Closing, the relevant Seller or Sellers, as applicable, shall deliver to Purchaser:

(i)     one or more certificates representing the issued Initial Purchase Shares, Second Purchase Shares or Third Purchase Shares, as applicable, each such certificate to be duly and validly endorsed in favor of Purchaser or accompanied by a separate stock power duly and validly executed by Seller or Sellers, as applicable, and otherwise sufficient to vest in Purchaser good title to such Common Shares;

(ii)     a certification of non-foreign status for Seller in the form and manner which complies with the requirements of Section 1445 of the Code and the regulations promulgated thereunder;

(iii)     an opinion of counsel, in form and substance acceptable to Purchaser, stating that the sale of the Common Shares hereunder is exempt from registration requirements of the United States securities laws; and

(iv)     all other previously undelivered documents required to be delivered by Seller or Sellers, as applicable, to Purchaser at or prior to the relevant Closing in connection with the Transactions.

Section 2.3     Deliveries by Purchaser. At each Closing, Purchaser shall transfer the amount of the Initial Purchase Payment, Second Purchase Payment or Third Purchase Payment, as applicable, as set forth in Section 1.2, to an account designated by Seller prior to the immediately applicable Closing by wire transfer in immediately available funds.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedule prepared and signed by each Seller and delivered to Purchaser simultaneously with the execution hereof, each Seller represents and warrants to Purchaser that all of the statements contained in this Article III are true as of the date of this Agreement (or, if made as of a specified date, as of such date). For purposes of the representations and warranties of Sellers contained herein, disclosure in any section of the Disclosure Schedule or other document delivered pursuant to this Agreement or in any documents or other information provided to Purchaser or Purchaser's representatives by each Seller or each Seller's representatives in connection with the Transactions of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by each Seller calling for disclosure of such information, whether or not such disclosure is specifically associated with or purports to respond to one or more or all of such representations or warranties. The inclusion of any information in any Section of the Disclosure Schedule or other document delivered by Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

Section 3.1    Authorization; Validity of Agreement.  Seller has full power and authority, and each of Eric Thompson and Betty Thompson represent that he or she, respectively, has the legal capacity, to execute and deliver this Agreement and to consummate the Transactions. No vote of, or consent by holders of any membership interests issued by Clear Creek is necessary to authorize the execution and delivery of this Agreement by Clear Creek.  No consent of any third party is necessary to authorize the execution and delivery of this Agreement by Eric Trust or Betty Trust.

Section 3.2    Execution; Validity of Agreement.   This Agreement has been duly executed and delivered by such Seller, is a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws of general application affecting enforcement of creditors' rights generally and (b) the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any proceeding therefor may be brought.

Section 3.3    Consents and Approvals; No Violations.  Except for the filings, permits, authorizations, consents and approvals as may be required under any state securities or blue sky laws, none of the execution, delivery or performance of this Agreement by such Seller, the consummation by such Seller of the Transactions or compliance by such Seller with any of the provisions hereof will (a) conflict with or result in any breach of any provision of the governing documents of Clear Creek, (b) require any filing with, or permit, authorization, consent or approval of, any Governmental Entity, (c) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which such Seller is a party or by which such Seller or Seller's respective properties or assets may be bound, or (d) violate any order, writ, injunction, decree, statute, rule or regulation applicable to such Seller, or any of such Seller's properties or assets.

Section 3.4    Ownership and Possession of Common Shares.  Such Seller is the record and beneficial owner of the Common Shares listed opposite such Seller's name on Schedule I hereto and has the sole power of disposition and the sole power to agree to all of the matters set forth in this Agreement, in each case with respect to all of such Common Shares, with no limitations, qualifications or restrictions on such rights.  There are no rights of first-refusal or pre-emptive rights, or other similar rights, with respect to any of such Seller's Shares. The certificates representing such Seller's Common Shares are now and at all times during the term hereof shall be held by such Seller or by a nominee or custodian for the sole and exclusive benefit of such Seller, fully-paid and non-assessable and free and clear of all Encumbrances whatsoever, except for any Encumbrances created by this Agreement and Encumbrances arising under the Securities Act or any applicable state securities laws.

Section 3.5    Good Title Conveyed.  The stock certificates, stock powers, endorsements, assignments and other instruments to be executed and delivered by such Seller to Purchaser at the relevant Closing will be valid and binding obligations of such Seller, enforceable in

6

accordance with their respective terms, and will effectively vest in Purchaser good title to all the Common Shares, free and clear of all Encumbrances.

Section 3.6    Legal Proceedings.  There are no actions, suits or proceedings of any kind pending or, to the knowledge of such Seller, threatened against such Seller which (i) could reasonably be expected to result in a material adverse effect on the Transactions or (ii) challenge the validity or enforceability of this Agreement, or seek to enjoin or prohibit consummation of, or seek other equitable relief with respect to, the Transactions contemplated by this Agreement. Neither such Seller nor such Seller's Common Shares are subject to any judgment, decree, injunction or order of any Governmental Entity that would adversely affect the Transactions.

Section 3.7    Company Action.  No vote of, or consent by, the holders of any class or series of capital stock issued by the Company is necessary to authorize the execution and delivery by such Seller of this Agreement or the consummation by it of the Transactions.

Section 3.8    Compliance with Laws.  To the knowledge of such Seller, the Company has complied in a timely manner and in all material respects with all laws, rules and regulations, ordinances, judgments, decrees, orders, writs and injunctions of all United States federal, state, local, foreign governments and agencies thereof that specifically apply to the business, properties or assets of the Company.

Section 3.9    Brokers or Finders.  Such Seller has not entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other firm or Person to any broker's or finder's fee or any other commission or similar fee in connection with any of the Transactions.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers that:

Section 4.1    Organization.  Purchaser is a limited partnership duly organized, validly existing and in good standing under the laws of Delaware and has all requisite corporate or other power and authority and all necessary governmental approvals to own, lease and operate its properties and to carry on its business as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power, authority, and governmental approvals would not have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the Transactions.

Section 4.2    Authorization; Validity of Agreement.  Purchaser has full power and authority to execute and deliver this Agreement and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions have been duly authorized, and no other action on the part of Purchaser is necessary to authorize the execution and delivery by Purchaser of this Agreement or the consummation of the Transactions. No vote of, or consent by, the holders of any class or series of securities issued by Purchaser is necessary to authorize the execution and delivery by Purchaser of this Agreement or the consummation by it of the Transactions. This Agreement has

7

been duly executed and delivered by Purchaser, and, is a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws of general application affecting enforcement of creditors' rights generally and (b) the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any proceeding therefor may be brought.

Section 4.3    Consents and Approvals; No Violations.    Except for authorizations, consents and approvals as may be required under any state securities or blue sky laws, none of the execution, delivery or performance of this Agreement by Purchaser, the consummation by Purchaser of the Transactions or compliance by Purchaser with any of the provisions hereof will (a) conflict with or result in any breach of any provision of the formation or governing documents of Purchaser, (b) require any filing with, or permit, authorization, consent or approval of, any Governmental Entity, (c) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which Purchaser is a party or by which it or any of its properties or assets may be bound, or (d) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Purchaser, or any of its properties or assets, excluding from the foregoing clauses (b), (c) and (d) such violations, breaches or defaults which would not, individually or in the aggregate, have a material adverse effect on Purchaser's ability to consummate the Transactions.

Section 4.4    Acquisition of Common Shares for Investment; Ability to Evaluate and Bear Risk.

(a)    Purchaser is acquiring the Common Shares for investment and not with a view toward, or for sale in connection with, any distribution thereof, nor with any present intention of distributing or selling the Common Shares. Purchaser agrees that the Common Shares may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and any applicable state securities laws, except pursuant to an exemption from such registration under such Act and such laws.

(b)    Purchaser is able to bear the economic risk of holding the Common Shares for an indefinite period, and has knowledge and experience in financial and business matters such that it is capable of evaluating the risks of the investment in the Common Shares.

Section 4.5    Availability of Funds.    Purchaser will at the relevant Closing have sufficient immediately available funds, in cash, to pay the relevant payment amount and to pay any other amounts payable pursuant to this Agreement and to effect the Transactions.

Section 4.6    Litigation.    There is no claim, action, suit, proceeding or, to the knowledge of Purchaser, governmental investigation pending or, to the knowledge of Purchaser, threatened against Purchaser or any of its Subsidiaries by or before any court or Governmental Entity that, individually or in the aggregate, would have or would reasonably be expected to impede the ability of Purchaser to complete the Closing in any respect.

Section 4.7    Brokers or Finders. Neither Purchaser nor any of its Subsidiaries or its Affiliates has entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other firm or Person to any broker's or finder's fee or any other commission or similar fee in connection with any of the Transactions.

## ARTICLE V

## COVENANTS

Section 5.1    Interim Operations of the Company. Except as expressly provided in this Agreement and except as set forth in the Disclosure Schedule and except as may be consented to in writing by Purchaser (such consent not to be unreasonably withheld or delayed) each Seller shall use its best efforts to procure that, after the date hereof and prior to the Third Purchase Closing Date:

(a)    the business of the Company shall be conducted substantially in the same manner as heretofore conducted and only in the ordinary course. The Company shall not institute any new methods or operations other than minor changes in the ordinary course of business;

(b)    shall not: (i) amend its certificate of incorporation or by-laws or similar organizational documents, (ii) issue, sell, transfer, pledge, dispose of or encumber any shares of any class or series of its capital stock, or securities convertible into or exchangeable for, or options, warrants, calls, commitments or rights of any kind to acquire, any shares of any class or series of its capital stock, (iii) declare, set aside or pay any dividend or other distribution payable in cash, stock or property with respect to any shares of any class or series of its capital stock, (iv) split, combine or reclassify any shares of any class or series of its stock, or (v) redeem, purchase or otherwise acquire directly or indirectly any shares of any class or series of its capital stock, or any instrument or security which consists of or includes a right to acquire such shares;

(c)    other than pursuant to the Loan Agreement, the Company shall not: (i) incur or assume any long-term debt, (ii) modify the terms of any Indebtedness or other liability, other than modifications of short term debt in the ordinary and usual course of business and consistent with past practice, or (iii) assume or guarantee the obligations of any other Person, except in the ordinary course of business;

(d)    the Company shall not make any change in the compensation payable or to become payable to any of its employees (other than normal recurring increases in the ordinary course of business or pursuant to plans, programs or agreements existing on the date hereof);

(e)    the Company shall not voluntarily permit any insurance policy naming it as a beneficiary or a loss payable payee to be cancelled or terminated prior to the Closing Date without notice to Purchaser, except policies providing coverage for losses not in excess of $50,000 which are replaced without diminution of or gaps in coverage;

(f)    the Company shall not adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Company;

9

(g)     the Company shall not change in any material respect any of the accounting methods used by it unless required or permitted by GAAP;

(h)     the Company shall not take, or agree to or commit to take, any action that would result in any of the conditions to each Closing set forth in Article VI not being satisfied in a material respect, or would make any representation or warranty of the Purchaser contained herein inaccurate in any material respect at, or as of any time prior to, the Closing Date, or that would materially impair the ability of Purchaser or Seller to consummate each Closing in accordance with the terms hereof or materially delay such consummation; and

(i)     the Company shall not enter into any written or oral agreement, contract, commitment or arrangement to do any of the foregoing.

Section 5.2     Access; Confidentiality. Each Seller shall cause the Company prior to the Closing to (i) give Purchaser and its authorized representatives reasonable access to all books, records, personnel, offices and other facilities and properties of the Company, (ii) permit Purchaser to make such copies and inspections thereof as Purchaser may reasonably request and (iii) cause the officers of the Company to furnish Purchaser with such financial and operating data and other information with respect to the business and properties of the Company as Purchaser may from time to time reasonably request; provided, however, that any such access shall be conducted at Purchaser's expense, at a reasonable time, and under the supervision of Sellers' or the Company's personnel.

Section 5.3     Efforts and Actions to Cause Closing to Occur. Prior to each of the Initial Purchase Closing, Second Purchase Closing and Third Purchase Closing, upon the terms and subject to the conditions of this Agreement, each Seller shall use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done and cooperate with Purchaser in order to do, all things necessary, proper or advisable (subject to any applicable laws) to consummate the relevant Closing and the other Transactions as promptly as practicable, including the preparation and filing of all forms, registrations and notices required to be filed to consummate the relevant Closing and the other Transactions and the taking of such actions as are necessary to obtain any requisite approvals, authorizations, consents, orders, licenses, permits, qualifications, exemptions or waivers by any third party or Governmental Entity. In addition, each Seller shall not take any action after the date hereof that could reasonably be expected to materially delay the obtaining of, or result in not obtaining, any permission, approval or consent from any Governmental Entity or other Person required to be obtained prior to the relevant closing. Nothing contained in this Agreement shall require Sellers to pay any consideration to any other Person from whom any such approvals, authorizations, consents, orders, licenses, permits, qualifications, exemptions or waiver is requested.

Section 5.4     Tax Matters. Each Seller promptly shall pay any Transfer Taxes payable in connection with the sale of any and all of its respective Common Shares pursuant to this Agreement.

Section 5.5     Common Shares. Each Seller covenants and agrees that, during the term of this Agreement, it shall not encumber, sell, transfer or otherwise dispose of any Common

Shares, or commit to any of the foregoing, and that it shall make and keep all of its respective Common Shares available for the purchase by Purchaser pursuant to the terms hereof.

## ARTICLE VI

## CONDITIONS

Section 6.1    Conditions to Each Party's Obligation to Effect Each Closing.    The respective obligation of each party to effect each Closing shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions:

(a)    Statutes; Court Orders.    No statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity which prohibits the consummation of the relevant Closing; and there shall be no order or injunction of a court of competent jurisdiction in effect precluding or prohibiting consummation of the relevant Closing provided, however, that the parties shall use their reasonable efforts to have any such order or injunction vacated or lifted; and

(b)    Consents Obtained.    All material consents of any Person necessary to the consummation of the relevant Closing and the other Transactions, including consents from parties to loans, contracts, leases or other agreements and consents from Governmental Entities, shall have been obtained.

(c)    Government Action.    There shall not be threatened or pending any suit, action or proceeding by any Governmental Entity seeking to restrain or prohibit the consummation of the relevant Closing or the performance of any of the other Transactions.

Section 6.2    Conditions to Obligations of Purchaser to Effect Initial Closing and Each Closing.    The obligations of Purchaser to consummate the Initial Closing shall be subject to Investor Rights Agreement having been executed and in full force and effect, and in addition, each relevant Closing shall be subject to the satisfaction on or prior to the relevant Closing Date of each of the following conditions:

(a)    Legal Action.    There shall not be threatened or pending any suit, action or proceeding seeking to impose material limitations on the ability of Purchaser effectively to exercise full rights of ownership of the Common Shares, or seeking to obtain from Purchaser any damages that are material to Purchaser.

(b)    Representations and Warranties.    All of the representations and warranties of Sellers set forth in this Agreement that are qualified as to materiality shall be true and complete in all respects and any such representations and warranties that are not so qualified shall be true and complete in all material respects, in each case as of the date of this Agreement (or if made as of a specified date, only as of such date).

(c)    Seller Breach.    Sellers shall not have failed to perform any obligation or to comply with any covenant of the Sellers to be performed or complied with by it under this Agreement.

11

(d)     Termination.   The Transactions shall not have been terminated or abandoned in accordance with the terms of this Agreement.

The foregoing conditions are for the sole benefit of Purchaser, may be waived by Purchaser, in whole or in part, at any time and from time to time in the sole discretion of Purchaser. The failure by Purchaser at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

Section 6.3     Conditions to Obligations of Seller to Effect Each Closing.   The obligations of the applicable Seller or Sellers to consummate the relevant Closing shall be subject to the satisfaction on or prior to the relevant Closing Date of each of the following conditions:

(a)     Legal Action.   There shall not be threatened or pending any suit, action or proceeding seeking to restrain or prohibit the consummation of the relevant Closing or the performance of any of the other Transactions, or seeking to obtain from Seller or Sellers, as applicable, any damages that are material to Seller or Sellers, as applicable.

(b)     Representations and Warranties.   All of the representations and warranties of Purchaser set forth in this Agreement that are qualified as to materiality shall be true and complete and any such representations and warranties that are not so qualified shall be true and complete in all material respects, in each case as of the date of this Agreement and as of the Closing Date (or if made as of a specified date, as of such date);

(c)     Purchaser Breach.   The Purchaser shall not have failed to perform respect any obligation or to comply with any covenant of the Purchaser to be performed or complied with by it under this Agreement;

(d)     Termination.   The Transactions shall not have been terminated or abandoned in accordance with the terms of this Agreement.

The foregoing conditions are for the sole benefit of Sellers, may be waived by Sellers, in whole or in part, at any time and from time to time in the sole discretion of Seller. The failure by Sellers at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

## ARTICLE VII

## TERMINATION

Section 7.1     Termination.   The Transactions may be terminated or abandoned at any time prior to the Closing Date:

(a)     By the mutual written consent of Purchaser and Sellers; or

(b)       By Purchaser or Sellers if any Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their best reasonable efforts to lift) which permanently restrains, enjoins or otherwise prohibits the acquisitions by Purchaser of any or all the Common Shares and such order, decree, ruling or other action shall have become final and non-appealable;

(c)       By Purchaser if any breach of a representation, warranty, covenant or other agreement referred to in such contained in this Agreement cannot be or has not been cured within 30 days after giving the written notice by Purchaser to Seller specifying such breach;

(d)       By Purchaser on or after December 31, 2015, if the Third Purchase Closing shall not have theretofore occurred and if the failure of the Third Purchase Closing to occur is not the result of a breach of a representation, warranty or covenant by Purchaser.

Section 7.2    Effect of Termination.  In the event of the termination or abandonment of the Transactions by either party hereto pursuant to the terms of this Agreement, written notice thereof shall forthwith be given to the other party specifying the provision hereof pursuant to which such termination or abandonment of the Transactions is made, and there shall be no liability or obligation thereafter on the part of Purchaser or Sellers except (a) for fraud or for willful breach of this Agreement prior to such termination or abandonment of the Transactions and (b) as set forth in Section 10.1.

## ARTICLE VIII

## INDEMNIFICATION

Section 8.1    Indemnification; Remedies.

(a)       Sellers shall jointly and severally indemnify, defend and hold harmless the Purchaser and its Affiliates from and against and in respect of all Purchaser Losses.

(b)       Sellers' indemnification obligations under Sections 8.1(a) shall be subject to each of the following limitations:

(i)       Sellers' indemnification obligations relating to Purchaser Losses shall survive only until the third anniversary of the Third Purchase Closing Date. No claim for the recovery of any Purchaser Losses may be asserted by any Purchaser Indemnified Person after the expiration of the applicable indemnification period; provided, however, that claims first asserted in writing by any Purchaser Indemnified Person with reasonable specificity prior to the expiration of the applicable indemnification period shall not thereafter be barred by the expiration of the applicable indemnification period.

(ii)      Each Purchaser Loss shall be reduced by (1) the amount of any insurance proceeds payable to Purchaser or any Purchaser Indemnified Person with respect to such loss and (2) any indemnity, contribution or other similar payment payable to Purchaser or any Purchaser Indemnified Person by any third party with respect to such loss.

13

(iii)      In no event shall Sellers' aggregate liability to Purchaser under this Agreement for breaches of representations or warranties, covenants or agreements, whether pursuant to this Article VIII or otherwise, exceed 100% of the Purchase Price.

(c)      Purchaser shall indemnify, defend and hold harmless the Sellers from and against and in respect of all Seller Losses.

(d)      Purchaser's indemnification obligations under Sections 8.1(c) shall be subject to each of the following limitations:

(i)      Purchaser's indemnification obligations relating to Seller Losses shall survive only until the first anniversary of the Third Purchase Closing Date. No claim for the recovery of any Seller Losses may be asserted by any Seller after the expiration of the applicable indemnification period; provided, however, that claims first asserted in writing by any Seller with reasonable specificity prior to the expiration of the applicable indemnification period shall not thereafter be barred by the expiration of the applicable indemnification period.

(ii)      Each Seller Loss shall be reduced by (1) the amount of any insurance proceeds payable to Seller with respect to such loss and (2) any indemnity, contribution or other similar payment payable to Seller by any third party with respect to such loss.

(iii)      In no event shall Purchaser's aggregate liability to Sellers under this Agreement for breaches of representations or warranties, covenants or agreements, whether pursuant to this Article VIII or otherwise, exceed 100% of the Purchase Price.

Section 8.2    Notice of Claim; Defense.

Purchaser shall give Sellers, and Sellers shall give Purchaser, prompt notice of any third-party claim that may give rise to any indemnification obligation under this Article VIII, together with the estimated amount of such claim. No indemnified party shall take any action the purpose of which is to prejudice the defense of any claim subject to indemnification hereunder or to induce a third party to assert a claim subject to indemnification hereunder.

Section 8.3    No Duplication; Sole Remedy Procedures.

(a)      Any liability for indemnification hereunder shall be determined without duplication of recovery by reason of the state of facts giving rise to such liability constituting a breach of more than one representation, warranty, covenant or agreement.

(b)      Purchaser's rights to indemnification as provided for in Section 8.1 for a breach of Seller's representations or warranties contained in this Agreement shall constitute Purchaser's sole remedy for such a breach, and Seller shall have no other liability or damages to Purchaser resulting from the breach.

14

(c)     Sellers' rights to indemnification as provided for in Section 8.1 for a breach of Purchaser's representations or warranties contained in this Agreement shall constitute Purchaser's sole remedy for such a breach, and Seller shall have no other liability or damages to Purchaser resulting from the breach.

(d)     The indemnification and other provisions of this Article VIII shall govern the procedure for all indemnification matters under this Agreement, except to the extent otherwise expressly provided herein.

## ARTICLE IX

## DEFINITIONS AND INTERPRETATION

Section 9.1     Definitions.   For all purposes of this Agreement, except as otherwise expressly provided or unless the context clearly requires otherwise:

"Affiliate" shall mean any other Person which directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with such Person. The term "control" (including the terms "controlled by" and "under common control with") as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" or "this Agreement" shall mean this Stock Purchase Agreement, together with the Disclosure Schedule.

"Betty Trust" shall mean BB and B Unitrust u/a/d 7/11/07.

"Clear Creek" shall mean Clear Creek Canyon, L.C., a Nevada limited liability company.

"Closing" shall mean either the Initial Purchase Closing, Second Purchase Closing or Third Purchase Closing, as applicable.

"Closing Date" shall mean the date on which the relevant Closing occurs.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Common Shares" shall mean shares of Common Stock subject to sale and purchase hereunder.

"Common Stock" shall mean common stock, without par value, of the Company.

"Company" shall mean AccessData Corp., a Utah corporation.

"Disclosure Schedule" shall mean the disclosure schedule of even date herewith prepared and signed by the Company and delivered to Purchaser simultaneously with the execution hereof as amended or supplemented by Seller pursuant to the terms hereof.

15

"Encumbrances" shall mean any and all liens, charges, security interests, options, claims, mortgages, pledges, proxies, voting trusts or agreements, obligations, understandings or arrangements or other restrictions on title or transfer of any nature whatsoever.

"Eric Trust" shall mean Slick Rock Canyon Unitrust u/a/d 7/11/07.

"GAAP" shall mean United States generally accepted accounting principles consistently applied.

"Governmental Entity" shall mean a court, arbitral tribunal, administrative agency or commission or other governmental or other regulatory authority or agency.

"Indebtedness" shall mean (a) all indebtedness for borrowed money or for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business and payable in accordance with customary practices), (b) any other indebtedness that is evidenced by a note, bond, debenture or similar instrument, (c) all obligations under financing leases, (d) all obligations in respect of acceptances issued or created, (e) all liabilities secured by any lien on any property and (f) all guarantee obligations.

"Initial Purchase Closing" shall mean the sale and transfer of the Initial Purchase Shares in accordance with Section 2.1(a) hereof.

"Initial Purchase Payment" shall mean $1,691,500.00.

"Initial Purchase Shares" shall mean 850,000 Common Shares.

"Investor Rights Agreement" shall mean that certain Investor Rights Agreement, dated as of July 30, 2007, by and among the Company, Purchaser, Seller and other Company stockholders named therein.

"Loan Agreement" shall mean that certain Loan Agreement, dated as of July 30, 2007, by and between Purchaser and the Company.

"Person" shall mean a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Entity or other entity or organization.

"Purchase Price" shall mean the sum of Initial Purchase Payment, Second Purchase Payment and Third Purchase Payment amounts.

"Purchaser" shall mean LAMASSU CAPITAL, L.P., a Delaware limited partnership.

"Purchaser Indemnified Persons" shall mean Purchaser and each of its Affiliates.

"Purchaser Losses" shall mean any and all actual losses, liabilities, damages, judgments, settlements and expenses (including interest and penalties recovered by a third party with respect thereto and reasonable attorneys' fees and expenses and reasonable accountants' fees and expenses incurred in the investigation or defense of any of the same or in asserting, preserving or

enforcing any of the rights of Purchaser arising under Article VIII) incurred by the Company or any of the Purchaser Indemnified Persons that arise out of (a) any breach by Seller of any of Seller's representations and warranties contained in or made by or pursuant to this Agreement or (b) any breach prior to the Third Purchase Closing by Seller of any covenants contained in this Agreement.

"Second Purchase Closing" shall mean the sale and transfer of the Second Purchase Shares in accordance with Section 2.1(b) hereof.

"Second Purchase Payment" shall mean the aggregate payment made by Purchaser pursuant to Section 1.2(b).

"Second Purchase Shares" shall mean 350,000 Common Shares.

"Seller" shall mean Eric Thompson, Eric Trust, Betty Thompson, Betty Trust or Clear Creek, as applicable.

"Sellers" shall mean, collectively, Eric Thompson, Eric Trust, Betty Thompson, Betty Trust and Clear Creek.

"Seller Losses" shall mean any and all actual losses, liabilities, damages, judgments, settlements and expenses (including interest and penalties recovered by a third party with respect thereto and reasonable attorneys' fees and expenses and reasonable accountants' fees and expenses incurred in the investigation or defense of any of the same or in asserting, preserving or enforcing any of the rights of Seller arising under Article VIII) incurred by the Seller that arise out of any breach by Purchaser of any of Purchaser's representations and warranties contained in or made by or pursuant to this Agreement.

"Tax" or "Taxes" shall mean all taxes, charges, fees, duties, levies, penalties or other assessments imposed by any federal, state, local or foreign govern mental authority, including income, gross receipts, excise, property, sales, gain, use, license, custom duty, unemployment, capital stock, transfer, franchise, payroll, withholding, social security, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, and shall include interest, penalties or additions attributable thereto or attributable to any failure to comply with any requirement regarding any tax returns.

"Third Purchase Closing" shall mean the sale and transfer of the Third Purchase Shares in accordance with Section 2.1(c) hereof.

"Third Purchase Payment" shall mean the aggregate payment made by Purchaser pursuant to Section 1.2(c).

"Third Purchase Shares" shall mean 375,000 Common Shares.

"Transactions" shall mean all of the transactions contemplated hereunder.

17

"Transfer Taxes" shall mean all sales (including bulk sales), use, transfer, recording, ad valorem, privilege, documentary, gains, gross receipts, registration, conveyance, excise, license, stamp, duties or similar Taxes and fees.

Section 9.2   Interpretation.

The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

Whenever the words "include", "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

The words "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

## ARTICLE X

### MISCELLANEOUS

Section 10.1   Fees and Expenses.  All costs and expenses incurred in connection with this Agreement and the consummation of the Transactions shall be paid by the party incurring such expenses, except as specifically provided to the contrary in this Agreement.

Section 10.2  <u>Amendment and Modification</u>.  This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement.

Section 10.3  <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed given when mailed, delivered personally, telecopied (which is confirmed) or sent by an overnight courier service, such as Federal Express, to the parties at the following addresses (or at such other address for a party as shall be specified by such party by like notice):

if to Purchaser, to:

21 Whitesands,
Newport Coast, CA  92657
Attention: Timothy Leehealey
Telephone: (949) 706-1397
Telecopy:  (949) 706-1397

with a copy to (which shall not constitute notice):

Kleinberg, Kaplan, Wolff & Cohen, P.C.
551 Fifth Avenue
New York, New York
Attention:    Lawrence D. Hui, Esq.
Telephone:    (212) 986-6000
Telecopy:     (212) 986-8866


if to Eric Thompson or Eric Trust, to:

7188 Ox Bow Circle
Tallahassee, Florida  32312
Attention: Eric Thompson
Telecopy: (850) 264-4471


with a copy to:

Curtis B. Hoffman
Attorney at Law
118 North 1600 West, Suite B
Mapleton, UT 84664
Telephone: (801) 491-8802
Telecopy:  (801) 491-2102

19

if to Betty Thompson or Betty Trust:

11361 Orangeview Rd.
Santa Ana, CA 92705
Attention: Betty Thompson
Telecopy: (714) 832-6516

with a copy to:

Curtis B. Hoffman
Attorney at Law
118 North 1600 West, Suite B
Mapleton, UT 84664
Telephone: (801) 491-8802
Telecopy: (801) 491-2102

Section 10.4   Counterparts.   This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties.

Section 10.5   Entire Agreement; No Third Party Beneficiaries.  This Agreement and the Confidentiality Agreement (a) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof and (b) are not intended to confer upon any Person other than the parties hereto and thereto any rights or remedies hereunder.

Section 10.6   Severability.  Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 10.7   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the principles of conflicts of law thereof.

20

Section 10.8 <u>Venue</u>. Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any federal court located in the State of New York or any New York state court in the event any dispute arises out of this Agreement or any of the Transactions, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court and (c) agrees that it shall not bring any action relating to this Agreement or any of the Transactions in any court other than a federal or state court sitting in the State of New York.

Section 10.9 <u>Extension; Waiver</u>. At any time prior to the Closing Date, either party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance by the other parties with any of the agreements or conditions contained in this Agreement. Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed by or on behalf of such party. The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights.

Section 10.10 <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party, except that Purchaser may assign, in its sole discretion, all its rights and interests hereunder to any Affiliate of Purchaser. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

LAMASSU CAPITAL, L.P., as Purchaser

By:    Timothy Leehealey, its General Partner

_____

ERIC THOMPSON, as Seller

_____

SLICK ROCK CANYON UNITRUST u/a/d 7/11/07], as Seller

By:    Eric Thompson, its Trustee

_____

BETTY THOMPSON, as Seller

_____

BB AND B UNITRUST u/a/d 7/11/07, as Seller

By:    Betty Thompson, its Trustee

_____

CLEAR CREEK CANYON, L.C., as Seller

By:    Eric Thompson, its manager

_____

Stock Purchase Agreement Signature Page

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**LAMASSU CAPITAL, L.P., as** Purchaser

By:     Timothy Leehealey, its General Partner

_____

**ERIC THOMPSON, as Seller**

_____

**SLICK ROCK CANYON UNITRUST u/a/d 7/11/07, as Seller**

By:     Eric Thompson, its Trustee

_____

**BETTY THOMPSON, as Seller**

_____

**BB AND B UNITRUST u/a/d 7/11/07, as Seller**

By:     Betty Thompson, its Trustee

_____

**CLEAR CREEK CANYON, L.C., as Seller**

By:     Eric Thompson, its manager

_____

Stock Purchase Agreement Signature Page

Schedule I

## Sellers' Common Share Ownership

| Seller | Common Shares |
|---|---|
| Eric Thompson and Slick Rock Canyon Unitrust u/a/d 7/11/07 | 268,000 |
| Betty Thompson and BB and B Unitrust u/a/d 7/11/07 | 162,500 |
| Clear Creek Canyon, L.C. | 1,144,500 |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------- x
                        :

LAMASSU HOLDINGS, L.L.C., a Delaware limited
liability company,
                        :

                    Plaintiff,       :

             - against -         :         Index No.

ERIC THOMPSON, CLEAR CREEK CANYON, LLC, :
ERIC THOMPSON as the trustee of the THOMPSON :
FAMILY REVOCABLE TRUST, MATTHEW
THOMPSON, RAQUELLE MORSE as trustee of the :
SAN JUAN GIFTING TRUST, BETTY THOMPSON, :
ERIC THOMPSON as trustee of the SLICK ROCK :
CANYON UNITRUST, RICHARD THOMPSON, JR., :
ALAN MCQUEEN, CATHY MCQUEEN, HOPE
KINGMA, SHERI TOROSIAN, DOUGLAS :
TOROSIAN, HEATHER PUTNAM as trustee of the :
PUTNAM FAMILY TRUST, JENNIFER MELDRUM, :
and JAY MELDRUM,
                        :

                Defendants.      :

------------------------------------------------- x

## CERTIFICATION IN SUPPORT OF PLAINTIFF'S
## REQUEST FOR ASSIGNMENT TO COMMERCIAL DIVISION

**MARC R. ROSEN,** counsel for plaintiff Lamassu Holdings, L.L.C. ("Lamassu"),

respectfully submits this certification and the accompanying copy of the complaint, pursuant to

Section 202.70 of the Uniform Rules for the Trial Courts, in support of Lamassu's request for the

assignment of this matter to the Commercial Division of this Court.

1

(1) I have reviewed and am fully familiar with the standards for assignment of cases to the Commercial Division set forth in Section 202.70, and certify that this case meets those standards. I therefore request that this case be assigned to the Division.

(2) Lamassu seeks compensatory damages arising from the defendants' express and implied breach of an investor rights agreement, and from the defendants' tortious interference with a loan agreement. In the first and second causes of action, Lamassu alleges that Lamassu and certain of the defendants entered into the investor rights agreement, which governs the parties' rights as shareholders of Software Forensics, Inc. ("SFI"), and that those defendants breached the control and governance provisions of the investor rights agreement, among other provisions. In the third cause of action, Lamassu alleges that all of the defendants tortiously interfered with Lamassu's performance of the loan agreement, under which Lamassu loaned SFI in excess of $23 million (together with investments), and caused breaches and defaults with respect to the loan agreement. In the fourth cause of action, Lamassu seeks equitable and injunctive relief and a judgment permanently enjoining the defendants from further breaching the investor rights agreement and further interfering with the performance of the loan agreement, or from engaging in related conduct.

(3) In this action, Lamassu seeks compensatory damages in excess of $100,000, exclusive of any punitive damages, interest, costs, disbursements and counsel fees.

(4) This case falls within the standards set out in Section 202.70(b) and does not come within the groups of cases set out in Section 202.70(c) that will not be heard in the Commercial Division, in that the complaint seeks damages and equitable and injunctive relief relating to a shareholder dispute and complex business transactions involving the parties including the

2

defendants' breach of the investor rights agreement and their tortious interference with the loan agreement.

Dated: April 9, 2012

KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

By: _____

Marc R. Rosen
David Parker
Netra Sreeprakash

551 Fifth Avenue, 18th Floor
New York, New York 10176
Telephone: (212) 986-6000
Facsimile: (212) 986-8866

Attorneys for Plaintiff
LAMASSU HOLDINGS, L.L.C.

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LAMASSU HOLDINGS, L.L.C., a Delaware limited
liability company,

                            Plaintiff,

                - against -

ERIC THOMPSON, CLEAR CREEK CANYON, LLC,
ERIC THOMPSON as the trustee of the THOMPSON
FAMILY REVOCABLE TRUST, MATTHEW
THOMPSON, RAQUELLE MORSE as trustee of the
SAN JUAN GIFTING TRUST, BETTY THOMPSON,
ERIC THOMPSON as trustee of the SLICK ROCK
CANYON UNITRUST, RICHARD THOMPSON, JR.,
ALAN MCQUEEN, CATHY MCQUEEN, HOPE
KINGMA, SHERI TOROSIAN, DOUGLAS
TOROSIAN, HEATHER PUTNAM as trustee of the
PUTNAM FAMILY TRUST, JENNIFER MELDRUM,
and JAY MELDRUM,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No.

**COMPLAINT**

Plaintiff Lamassu Holdings, L.L.C. ("Lamassu"), by its attorneys Kleinberg, Kaplan,

Wolff & Cohen, P.C., as and for its complaint against defendants Eric Thompson, Clear Creek

Canyon, LLC, Eric Thompson as the trustee of the Thompson Family Revocable Trust, Matthew

Thompson, Raquelle Morse as trustee of the San Juan Gifting Trust, Betty Thompson, Eric

Thompson as the trustee of the Slick Rock Canyon Unitrust, Richard Thompson, Jr., Alan

McQueen, Cathy McQueen, Hope Kingma, Sheri Torosian, Douglas Torosian, Heather Putnam

as the trustee of the Putnam Family Trust, Jennifer Meldrum, and Jay Meldrum (collectively, the

"Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      In 2007, Lamassu agreed to loan money to Software Forensics, Inc. ("SFI").
Before Lamassu made the loans, SFI and the SFI shareholders agreed that SFI would be run by a
board of directors which would fully represent the interests of Lamassu and its very substantial
investment in SFI.  SFI and the SFI shareholders also agreed that Lamassu's loans could be
converted into SFI stock.  Defendants now want to change that 2007 deal.  This lawsuit arises
from Defendants' unlawful efforts to undermine Lamassu's rights under a loan agreement,
Defendants' breach of an investor rights agreement and other wrongdoing committed by them.

2.      Several years ago, SFI was struggling financially.  In order to increase its working
capital and to develop its products, SFI sought investors.  After being solicited for an investment,
Lamassu purchased SFI stock and agreed to make loans and investments in the company in
excess of $23 million.  As a direct result of Lamassu's investment, SFI was revived.  Before
Lamassu made its investment, however, it wanted to ensure that the interests of Lamassu would
be protected subsequent to this loan and investment.  Therefore, the parties entered into an
Investor Rights Agreement dated as of July 30, 2007 (the "Investor Rights Agreement"), which
was a condition precedent to any stock purchase or loan agreement.  A copy of the Investor
Rights Agreement is attached as Exhibit A.  Immediately thereafter, Lamassu entered into the
Loan Agreement dated July 30, 2007 (the Loan Agreement") and the Stock Purchase Agreement
also dated July 30, 2007 (the "Stock Purchase Agreement"), copies of which are annexed hereto
as Exhibit B and Exhibit C, respectively.

3.      The Investor Rights Agreement and the Stock Purchase Agreement were between
Lamassu and AccessData Corp. and the founding shareholders of AccessData Corp.  The name
"AccessData Corp." was later changed to Software Forensics, Inc.  The assets of AccessData
Corp. (now SFI) were then transferred to AccessData Group LLC ("ADG"), a Delaware limited

liability company with its headquarters in Lindon, Utah. SFI owns 75% of ADG. The remaining 25% of ADG is owned by CT Corporation. The $23 million in loans and investments by Lamassu with respect to SFI have been used to develop and grow the business activities of ADG.

4.      After the cash infusion provided by Lamassu, the business of ADG has flourished. Defendant Eric Thompson and the other Defendants have grown dissatisfied with the voting, governance and control structure of SFI which they agreed to in 2007 while SFI and its subsidiary were languishing.   Now Defendants want to unilaterally change the original agreements, and Lamassu will not agree to do so.

5.      In December 2011, the SFI Board of Directors removed Eric Thompson from the Board of Managers of SFI's subsidiary (i.e., ADG) as a result of his disruptive behavior. Subsequently, Lamassu exercised its conversion rights under the Loan Agreement and converted all of its loans into SFI common stock. Thereafter, Defendants engaged in series of actions and submitted ineffectual shareholder resolutions in an effort to divest the SFI Board of Directors of their duties and responsibilities.

6.      During January and February 2012 (on at least five occasions), Defendant Eric Thompson, acting on behalf of himself and each of the Defendants, sought to amend SFI's by-laws and submitted proposals seeking to eviscerate Lamassu's rights under the Investor Rights Agreement, and attempting to circumvent the governance powers vested in the SFI Board of Directors.  In direct contradiction to the Investor Rights Agreement, Defendant Eric Thompson solicited proxies from other shareholders and then voted the shares in favor of an ill-conceived plan to grant SFI shareholders rights to make decisions which were specifically reserved to the SFI Board. Defendants also interfered with the performance of the Loan Agreement between Lamassu and SFI by attempting to halt the issuance of the shares of SFI common stock to Lamassu, despite Lamassu's entitlement to the shares pursuant to the conversion option

expressly contained in the Loan Agreement, and by purporting to amend SFI's by-laws without Lamassu's advance permission, which constitutes an event of default under the Loan Agreement.

7.      Accordingly, Lamassu is entitled to the relief requested herein, including an award of compensatory and punitive damages and injunctive relief to prevent further breaches by Defendants.

## THE PARTIES

8.      Plaintiff Lamassu, formerly known as Lamassu Capital, L.P., is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York, County of Westchester.

9.      Defendant Eric Thompson has represented under oath that he is an individual residing in the State of Florida.

10.      Defendant Clear Creek Canyon, LLC, by and through its manager Eric Thompson, has represented under oath that it is a limited liability company organized under the laws of the State of Nevada, with its principal place of business in the State of Florida.

11.      Defendant Eric Thompson has represented under oath that he is the trustee of the Thompson Family Revocable Trust and he resides in the State of Florida.

12.      Upon information and belief, Defendant Matthew Thompson is an individual residing in the State of Florida.

13.      Upon information and belief, Defendant Raquelle Morse is the trustee of the San Juan Gifting Trust, and she resides in the State of Florida.

14.      Upon information and belief, Defendant Betty Thompson is an individual residing in the State of California.

15.     Upon information and belief, Defendant Eric Thompson is the trustee of the Slick Rock Canyon Unitrust organized under the laws of the State of Utah, and he resides in the State of Florida.

16.     Upon information and belief, Defendant Richard Thompson, Jr. is an individual residing in the State of California.

17.     Upon information and belief, Defendant Alan McQueen is an individual residing in the State of California.

18.     Upon information and belief, Defendant Cathy McQueen is an individual residing in the State of California.

19.     Upon information and belief, Defendant Hope Kingma is an individual residing in the State of California.

20.     Upon information and belief, Defendant Sheri Torosian is an individual residing in the State of New Hampshire.

21.     Upon information and belief, Defendant Douglas Torosian is an individual residing in the State of New Hampshire.

22.     Upon information and belief, Defendant Heather Putnam as the trustee of the Putnam Family Trust is organized under the laws of the State of California, and she resides in the State of California.

23.     Upon information and belief, Defendant Jennifer Meldrum is an individual residing in the State of Texas.

24.     Upon information and belief, Defendant Jay Meldrum is an individual residing in the State of Texas.

## GENERAL ALLEGATIONS

A. *Lamassu's Investment in SFI*

25.     AccessData Corp. was founded in 1992 by Defendant Eric Thompson.  As discussed earlier, in 2010, AccessData Corp. changed it name to Software Forensics, Inc.  SFI then transferred its operating assets to its subsidiary, ADG.  In effect, SFI became the parent company of ADG and owned 75% of ADG common stock.  ADG is in the business of developing software to provide digital forensics and e-discovery solutions.

26.     At the time SFI was incorporated, Defendants owned the majority of SFI's common stock.

27.     In 2007, after struggling with a lack of capital, SFI solicited investors to provide additional capital.  SFI solicited Lamassu as an investor.

28.     Lamassu, through stock purchases and loan commitments, agreed to invest more than $23 million in SFI.

29.     Lamassu's investment in SFI was structured by way of three interrelated agreements – the Investor Rights Agreement, the Loan Agreement and the Stock Purchase Agreement, discussed below – whereby a new governance and ownership structure for SFI was established.

30.     In connection with Lamassu's investment, SFI agreed to hire Tim Leehealey, who, until 2010, was a part owner of Lamassu, to serve as SFI's Chief Executive officer; and Mr. Leehealey became a director of SFI.

31.     Since Lamassu's investment and under Mr. Leehealey's management, SFI's sales have grown to approximately $76 million in 2011, and SFI's value has increased substantially.

B. *Lamassu's Investment and Financing Structure*

i.   The Investor Rights Agreement

32.   In consideration for Lamassu's investment in SFI, and given the significant change in SFI's capitalization, share ownership and management, Lamassu, SFI and Defendants Eric Thompson, Clear Creek Canyon, LLC, Matthew Thompson, Raquelle Morse as trustee of the San Juan Gifting Trust, Betty Thompson, and Eric Thompson as trustee of the Slick Rock Canyon Unitrust, among others, executed the Investor Rights Agreement

33.   The purpose of the Investor Rights Agreement was to specify by contract how the business would be managed and controlled after Lamassu's investment; according to the Stock Purchase Agreement's recitals, "the Company and Company's stockholders entered [the] Investor Rights Agreement to set forth the parties' agreement with respect to the Company's goverance and certain voting rights of [Lamassu]."

34.   The Investor Rights Agreement provided, *inter alia*, that (1) the composition of the SFI Board of Directors would be determined exclusively by Article 3 of the Investor Rights Agreement, and (2) the SFI Board of Directors shall make all substantive decisions in regards to SFI, including SFI's stock ownership of ADG.

35.   The Investor Rights Agreement, in Section 3.1, specifically recites the parties' intent and agreement as to the composition of the SFI Board of Directors.

36.   The Investor Rights Agreement provides, *inter alia*, that the SFI Board of Directors shall have five members, that Lamassu shall have the right to nominate one board member acceptable to Eric Thompson, and that, in addition to Eric Thompson, Mr. Thompson

shall have the right to nominate one board member (the "Second Board Member") provided that
such person is acceptable to Lamassu:

> Eric Thompson ... will have the right to nominate one additional member of the
> Board of Directors, provided that such person is acceptable to the Investor
> [Lamassu].

Investor Rights Agreement, Section 3.1(b) (emphasis in original).

37.     The Investor Rights Agreement further provides that Lamassu and Mr. Thompson
together shall nominate the fifth member of the SFI Board of Directors (the "Fifth Board
Member") but only with the consent of both of them, and that in the event Lamassu and Mr.
Thompson cannot agree on the Fifth Board Member, the then-current president of SFI shall serve
as the Fifth Board Member:

> The Investor [Lamassu] and Eric Thompson will together nominate the fifth
> member of the Board of Directors, who will serve only with the mutual consent of
> the Investor and Eric Thompson, and each of the Investor and Eric Thompson will
> have the right to require the resignation of such Board member; provided that
> whenever the Investor and Eric Thompson cannot agree on who will serve as the
> fifth member of the Board of Directors, the then-current President of
> Company [SFI] will serve as the fifth member of the Board of Directors, subject
> to being removed by the mutual consent of the Investor and Eric Thompson.

Id., Section 3.1(e).

38.     In addition, the Investor Rights Agreement, obligates Defendants Eric Thompson,
Clear Creek Canyon, LLC, Matthew Thompson, Raquelle Morse as trustee of the San Juan
Gifting Trust, Betty Thompson, and Eric Thompson as trustee of the Slick Rock Canyon Unitrust
to vote their shares in favor of an SFI board composition in accordance with the Investor Rights
Agreement:

> Each Stockholder ... agree[s] to vote all of their respective shares of the capital
> stock of the Company having voting power (and any other shares over which they
> exercise voting control), to the extent they hold such shares of capital stock at the
> relevant time, in favor of the Board of Directors comprised in accordance with
> Section 3.1 above.

*Id.*, Section 3.2.

39.     The effect of these provisions was to eliminate shareholders' control of any material matter related to the business or goverance of SFI, except the sale of SFI; provide Defendants and Lamassu with equal representation on the SFI Board of Directors; set up a fifth, independent director who would possess a swing vote and act as a tie-breaker; and prevent the parties, including Defendants, from attempting to circumvent the foregoing control provisions.

40.     The Investor Rights Agreement provides that each of the parties:

(a) consents to submit itself to the personal jurisdiction of any federal or state court in the State of New York in the event any dispute arises out of this Agreement (including exhibits hereto) or any of the transactions contemplated hereunder, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court and (c) agrees that it shall not bring any action relating to this Agreement or any of the transactions contemplated hereunder in any court other than a federal or state court sitting in the State of New York.

*Id.*, Section 5.15.

ii. The Loan Agreement

41.     On July 30, 2007, Lamassu and SFI executed the Loan Agreement. On or about September 25, 2007, they executed an amendment to the Loan Agreement in order to mutually correct a typographical error (together, the "Loan Agreement").

42.     Pursuant to the Loan Agreement, Lamassu agreed to lend SFI up to $18,832,297 (the "Loan Amount"), payable in three tranches (or what is referred to in the Loan Agreement as the "Initial Portion", the "Second Portion" and the "Third Portion") – $5,869,803.94 was to be drawn by SFI on the date of the closing of the Loan Agreement, and the Second and Third Portions of the Loan Amount could be drawn by SFI only if the company met specific conditions.

43.     Under the Loan Agreement, SFI also granted Lamassu an option exercisable in Lamassu's sole discretion to convert any or all of the Loan Amount – the funded and unfunded

portions – into common stock of SFI based upon specified conversion prices set forth in the Loan Agreement.

44.     The conversion option represented significant consideration to Lamassu and played a critical role in inducing Lamassu to enter into the Loan Agreement. The loans made by Lamassu were unsecured and bore no interest. Lamassu would not have invested in SFI if the unfettered conversion of debt to equity was not part of the investment.

45.     In August 2008, SFI needed additional capital and after extensive deliberations by the Board of Directors, SFI drew down the Second Portion and borrowed from Lamassu an additional sum of $4,595,697.06, representing the second tranche under the Loan Agreement.

46.     The Loan Agreement provides that all actions relating to the Loan Agreement shall be commenced in any federal or state court in New York County in the State of New York, stating:

> Any legal suit, action or proceeding against Lender [Lamassu] or Borrower [SFI] arising out of or relating to this [Loan] Agreement shall be instituted in any federal or state court in New York County, New York.  Borrower hereby irrevocably submits to the jurisdiction of any such court in any such suit, action or proceeding.

Loan Agreement, Section 8.3(b).

### iii.    The Stock Purchase Agreement

47.     On or about July 30, 2007, Lamassu and Defendant Eric Thompson and certain of his family members and affiliates, including Defendant Clear Creek Canyon, executed the Stock Purchase Agreement.

48.     Under the Stock Purchase Agreement, Lamassu agreed to immediately purchase 850,000 shares of SFI common stock in exchange for its payment of $1,691,500 to Defendant Eric Thompson and his affiliated group.

49.    Mr. Thompson and his affiliates also granted Lamassu an option under the Stock Purchase Agreement to buy an additional 725,000 shares from them on terms and conditions specified in the Stock Purchase Agreement.

50.    By October 2010, Lamassu decided to convert some of the Loan Amount into stock and exercised its right to purchase all 1,575,000 shares for which it had an option under the Stock Purchase Agreement.

51.    The Stock Purchase Agreement provides that each party

consents to submit itself to the personal jurisdiction of any federal court located in the State of New York or any New York state court in the event any dispute arises out of this Agreement or any of the Transactions [and each] agrees that it shall not bring any action relating to this Agreement or any of the Transactions in any court other than a federal or state court sitting in the State of New York.

Stock Purchase Agreement, Section 10.8.

C.    *Lamassu's Conversion of the Debt Under the Loan Agreement*

52.    In early 2012, Lamassu exercised its conversion rights under the Loan Agreement and converted the entire indebtedness under the Loan Agreement – $18,832,297, representing the funded and unfunded portions – into common stock of SFI.

53.    On January 24, 2012, Lamassu transmitted to SFI the sum of $8,266,796, representing the undrawn amount under the Loan Agreement.  On January 27, 2012, Lamassu delivered to SFI the requisite exercise notice in accordance with the Loan Agreement, stating that Lamassu is "exercising its right to convert all three tranches of the loan agreement dated July 30, 2007 into equity of Software Forensics.  The total amount being converted is $18,832,297."

54.    Lamassu sent another written notice of exercise to SFI on January 28, 2012, reiterating Lamassu's request to exercise its conversion rights under the Loan Agreement.

55.    Based upon the foregoing, Lamassu was entitled to receive 6,915,249 shares of SFI common stock.

11

56.     Following Lamassu's exercise notice, SFI issued to Lamassu stock certificate SFI-37 dated January 31, 2012, representing 6,915,249 shares of SFI common stock, and updated SFI's stock register to reflect the issuance of these shares as of January 31, 2012.

57.     Defendant Eric Thompson voiced objections to the number of shares issued to Lamassu, prompting SFI's Board of Directors to form a special committee, which investigated the conversion issue, concluded that the shares were properly issued to Lamassu, and reported its conclusions to the SFI Board of Directors at a meeting held on March 7, 2012.

58.     Thereafter, the SFI Board of Directors voted to ratify the January 31, 2012 issuance of 6,915,249 shares of common stock to Lamassu.

59.     Presently, there are 18,263,685 shares of SFI common stock issued and outstanding, with Lamassu owning 9,193,416 shares of SFI common stock and Defendant Eric Thompson and his affiliates owning 8,136,556 shares of SFI common stock.

D.     *Defendants' Breaches of the Investor Rights Agreement and Their Interference with the Loan Agreement and Other Wrongdoing*

60.     In December 2011, the SFI Board of Directors met, thoroughly discussed and then decided to remove Defendant Eric Thompson from the ADG Board of Managers on the ground that his behavior and decisions were disruptive and detrimental to ADG.

61.     Shortly thereafter, as a result of Defendant Eric Thompson's removal from the ADG Board of Managers, Defendants commenced a series of actions designed to undermine the control, voting and governance structure set forth in the Investor Rights Agreement and the Loan Agreement including, without limitation, the following actions (collectively, the "Defendants' Improper Actions"):

    i.     On or about January 27, 2012, Defendant Eric Thompson sponsored and initiated an unannounced action by written consent of shareholders to amend the SFI by-laws. The proposed by-law amendment was intended to strip power and authority from the SFI Board of Directors by providing, *inter alia*, that "each Director [of

SFI] shall be given the number of votes equal to the number of active members of the Corporation Board of Directors multiplied times the number of Representatives in the Subsidiary," that "[d]irectors shall have the right to cumulate their votes, meaning that each director is entitled to cast any number of votes for a single candidate or distribute the votes among two or more candidates," and that "[t]he intent of this Section is to enable each director of the Corporation to be proportionately represented on the Subsidiary's Board of Managers ... and to avoid allowing a simple majority of the Corporation's Board of Directors to appoint all the Representatives of a Subsidiary." The proposed amendment was inconsistent with the terms of the Investor Rights Agreement by voiding the governance powers contractually vested in the SFI Board of Directors, and by purporting to alter the procedure by which members of the ADG Board of Managers were appointed by the SFI Board of Directors. The purpose of the by-law amendment was to allow Defendant Eric Thompson to reappoint himself to the ADG Board of Managers regardless of how the majority of the SFI Board of Directors voted on the matter, and was contrary to Utah corporate law which requires majority voting at the board level.

ii.  On or about January 27, 2012, Defendant Eric Thompson proposed by written consent of SFI shareholders to amend the SFI by-laws to provide that "[b]efore the Corporation issues shares ... to any current or former employee, officer or director of the Corporation, or other person or entity, (a) the Board of Directors must determine that the consideration received or to be received for the shares ... is adequate and (b) the shareholders must approve such issuance of shares ... by the affirmative vote ... of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take action at a meeting at which all shareholders entitled to vote on the action were present and voted." The proposed amendment purported to circumvent the terms of the Loan Agreement by requiring that SFI re-review the adequacy of the already-approved transaction, and by subjecting the issuance of shares to key employees to a shareholder vote.

iii.  On or about February 7, 2012, Defendant Eric Thompson sought the written consent of the SFI Board of Directors to replace Royce Bybee, then a director on the SFI Board of Directors, with Omar Leeman notwithstanding that Lamassu did not approve that proposal. Mr. Thompson's conduct constituted a violation of the Investor Rights Agreement because he sought to replace a member of the SFI Board of Directors without the approval of Lamassu.

iv.  On or about February 8, 2012, Defendant Eric Thompson delivered written shareholder consents purporting to amend the SFI by-laws to nullify the SFI Board of Directors' authority to appoint and remove officers of SFI and granting that authority to the shareholders. This action was intended by Defendants to remove the SFI Board of Directors from goverance of the corporation, and was inconsistent with the terms of the Investor Rights Agreement, including the Fifth Board Member selection provision. If the officers of SFI could be picked by the

shareholders, then the Fifth Board Member could be selected unilaterally without the directors' input or vote and in violation of the Investor Rights Agreement.

v.   On or about February 8, 2012, Defendant Eric Thompson also delivered written shareholder consents purporting to remove Kent Millington as the President and Secretary of SFI, to appoint Randy Moe as the President and Omar Leeman as the Secretary of SFI, and to remove Mr. Millington as the independent Fifth Board Member on the SFI Board of Directors. The proposed consents violated the terms of the Investor Rights Agreement by negating the powers contractually vested in the SFI Board of Directors, and by seeking to remove the SFI Board of Directors from goverance of the corporation. In addition, the Investor Rights Agreement provided that if the parties could not agree on the Fifth Board Member, then the President of SFI would serve in that role. Since Mr. Millington was also the President of SFI, the proposed consents represented an effort to circumvent and breach the Investor Rights Agreement. By these actions, Defendants sought to vote their shares in favor of an SFI Board of Director composition in violation of the Investor Rights Agreement.

vi.   On or about February 11, 2012, Defendant Eric Thompson sought to have a shareholders meeting to approve the amendments submitted in connection with the January 27 actions by written consent – actions that violate the terms of the Investor Rights Agreement and undermine the Loan Agreement. By virtue of Mr. Thompson's actions on and about January 27 and February 11, the SFI by-laws were amended at the time.

vii.   On or about February 17, 2012, Defendant Eric Thompson sent to the shareholders a notice of a special meeting of the shareholders – signed by Mr. Moe, purporting to act in the capacity as SFI's President – scheduled for February 28, 2012, to vote on proposed amendments to the SFI by-laws seeking again to remove and replace Mr. Millington as the President of SFI. These actions were inconsistent with the terms of the Investor Rights Agreement and negated the powers contractually vested in the SFI Board of Directors and improperly sought to remove the SFI Board of Directors from goverance of the corporation.

viii.   On or about February 17, 2012, Defendant Eric Thompson, in connection with the notice of the February 28, 2012 special meeting of the shareholders, submitted proposed amendments to the SFI by-laws seeking to remove and replace Mr. Millington as the independent Fifth Board Member of the SFI Board of Directors, and to replace Mr. Royce Bybee, who resigned from the SFI Board of Directors as of December 13, 2011, with Mr. Omar Leeman, although Lamassu advised Mr. Thompson that Mr. Leeman was not acceptable to Lamassu since he was previously employed by the company and that employment was terminated. These actions breached the terms of the Investor Rights Agreement and improperly sought to remove the SFI Board of Directors from goverance of the corporation. Mr. Thompson and the Defendants again sought to vote their shares in favor of an SFI Board of Directors composition in violation of the Investor Rights Agreement.

ix.     On or about January 27, 2012, February 8, 2012 and February 17, 2012, as set forth above, Defendant Eric Thompson endeavored to amend the SFI by-laws without Lamassu's permission, which constituted an event of default under the Loan Agreement. Mr. Thompson sought to frustrate SFI's performance under the Investor Rights Agreement and the Loan Agreement.

62.     Upon information and belief, at all relevant times, Defendant Eric Thompson engaged in Defendants' Improper Actions on behalf of himself, as Trustee of the Thompson Family Revocable Trust and as agent for each of the Defendants, all of whom are affiliates and/or closely related to each other.

63.     Upon information and belief, Defendants, with full knowledge of their contractual obligations and the terms of the Investor Rights Agreement and the Loan Agreement, participated in the planning of Defendants' Improper Actions, authorized Mr. Thompson to carry out these actions and actively aided and assisted Mr. Thompson in doing so by authorizing, signing and/or delivering written consents and proxies to be submitted to SFI with respect to Defendants' Improper Actions.

64.     Defendant Eric Thompson, on behalf of himself and all of the Defendants, with respect to Defendants' Improper Actions, communicated with Lamassu and its representatives at their business office, which, since 2010, has been located in Westchester County, New York.

65.     Based upon the foregoing, Defendants Eric Thompson, Clear Creek Canyon, LLC, Matthew Thompson, Raquelle Morse as trustee of the San Juan Gifting Trust, Betty Thompson, and Eric Thompson as trustee of the Slick Rock Canyon Unitrust repeatedly violated the Investor Rights Agreement, and Defendants wrongfully interfered with the Loan Agreement.

66.     On or about March 8, 2012, Defendants Thompson (in his capacity as an individual and as trustee of the Thompson Family Revocable Trust), Clear Creek Canyon, LLC, Matthew Thompson and Raquelle Morese as trustee of the San Juan Gifting Trust filed a verified

15

Complaint against Lamassu in the Fourth Judicial District Court, Utah County, State of Utah, Civil No. 120400331, styled *Eric Thompson, an individual, Clear Creek Canyon, LLC, a Nevada limited liability company, Eric Thompson as the trustee of the Thompson Family Revocable Trust, Matthew Thompson, an individual, and Raquelle Morse, as trustee of the San Juan Gifting Trust vs. Software Forensics, Inc., a Utah corporation, Lamassu Holdings, LLC, a Delaware limited liability company, Timothy Leehealey, an individual, Kent Millington, an individual, and Doe Defendants 1 through 10* (the "Utah Lawsuit").

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT
### (Investor Rights Agreement)

67.     Lamassu repeats and realleges the allegations contained in Paragraphs 1 through 66 above as if fully set forth herein.

68.     The Investor Rights Agreement between Lamassu and Defendants Eric Thompson, Clear Creek Canyon, LLC, Matthew Thompson, Raquelle Morse as trustee of the San Juan Gifting Trust, Betty Thompson, and Eric Thompson as trustee of the Slick Rock Canyon Unitrust, and their successors in interest, is a valid contract.

69.     Defendants Eric Thompson, Clear Creek Canyon, LLC, Matthew Thompson, Raquelle Morse as trustee of the San Juan Gifting Trust, Betty Thompson, and Eric Thompson as trustee of the Slick Rock Canyon Unitrust each have breached the Investors Rights Agreement as result of Defendants' Improper Actions as described in Paragraph 61; and Defendants Eric Thompson, Clear Creek Canyon, LLC, Matthew Thompson, and Raquelle Morse as trustee of the San Juan Gifting Trust also each have breached the Investors Rights Agreement as result of their filing of the Utah Lawsuit in violation of Section 5.15 of the Investor Rights Agreement.

70.     Lamassu has been damaged by Defendants' Improper Actions, and by the filing of the Utah Lawsuit, and is entitled to recover compensatory damages from Defendants Eric

16

Thompson, Clear Creek Canyon, LLC, Matthew Thompson, Raquelle Morse as trustee of the San Juan Gifting Trust, Betty Thompson, and Eric Thompson as trustee of the Slick Rock Canyon Unitrust, jointly and severally, in an amount to be determined at trial and in excess of $100,000, plus interest.

**SECOND CAUSE OF ACTION –**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**
**(Investor Rights Agreement)**

71.    Lamassu repeats and realleges the allegations contained in Paragraphs 1 through 70 above as if fully set forth herein.

72.    Defendants Eric Thompson, Clear Creek Canyon, LLC, Matthew Thompson, Raquelle Morse as trustee of the San Juan Gifting Trust, Betty Thompson, and Eric Thompson as trustee of the Slick Rock Canyon Unitrust have breached their duty of good faith and fair dealing implied in the Investor Rights Agreement by undermining the control, voting and goverance structure set forth in the Investor Rights Agreement, and by thwarting Lamassu's other rights under the Investor Rights Agreement including, without limitation, the right to have any dispute concerning the Investor Rights Agreement be heard in the New York federal or state courts.

73.    Lamassu has been damaged by the foregoing and is entitled to recover compensatory damages from Defendants Eric Thompson, Clear Creek Canyon, LLC, Matthew Thompson, Raquelle Morse as trustee of the San Juan Gifting Trust, Betty Thompson, and Eric Thompson as trustee of the Slick Rock Canyon Unitrust, jointly and severally, in an amount to be determined at trial and in excess of $100,000, plus interest.

### THIRD CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH CONTRACT
### (The Loan Agreement)

74.    Lamassu repeats and realleges the allegations contained in paragraphs 1 through 73 above as if fully set forth herein.

75.    The Loan Agreement between Lamassu and SFI is a valid contract.

76.    Defendants – all of them, directly or through their agent Defendant Eric Thompson – knew of the existence of the Loan Agreement and, by virtue of Defendants' Improper Actions with respect to the Loan Agreement, intentionally caused the breach of the Loan Agreement without justification.

77.    Defendants' interference with the Loan Agreement and the performance thereof included their efforts to halt the lawful conversion of the Lamassu loans into shares of SFI common stock and to contest the value at which the conversion was to take place despite Lamassu's entitlement to the shares pursuant to the conversion option under the Loan Agreement; the filing of the Utah Lawsuit in contravention of the terms of the Loan Agreement; the amendment of SFI's by-laws without Lamassu's advance permission, which constitutes an event of default under the Loan Agreement; and Defendants' frustration of the parties' performance under the Loan Agreement.

78.    The foregoing conduct was malicious and wantonly dishonest.

79.    By reason of the foregoing, Lamassu has been damaged and is entitled to recover from all of the Defendants, jointly and severally, compensatory damages in an amount to be determined at trial and in excess of $100,000, plus punitive damages and interest.

## FOURTH CAUSE OF ACTION – INJUNCTION

80.     Lamassu repeats and realleges the allegations contained in paragraphs 1 through 79 above as if fully set forth herein.

81.     As evidenced by Defendants' Improper Actions, Defendants repeatedly have breached the Investor Rights Agreement and interfered with the performance of the Loan Agreement and absent an injunction, will continue to do so in the future.

82.     Lamassu has no adequate remedy at law and will be irreparably harmed unless the Court issues an injunction permanently enjoining the Defendants, all of them, from engaging in Defendants' Improper Actions, further breaching the Investor Rights Agreement and further interfering with the performance of the Loan Agreement in the future.

83.     By reason of the foregoing, Lamassu is entitled to an injunction permanently enjoining the Defendants, all of them, from engaging in Defendants' Improper Actions, breaching the Investor Rights Agreement and interfering with the performance of the Loan Agreement.

**WHEREFORE,** Lamassu demands judgment against Defendants, jointly and severally, as follows:

(a) On the first cause of action, for compensatory damages in an amount to be determined at trial and in excess of $100,000, plus interest;

(b) On the second cause of action, for compensatory damages in an amount to be determined at trial and in excess of $100,000, plus interest;

(c) On the third cause of action, for compensatory damages in an amount to be determined at trial and in excess of $100,000, plus punitive damages and interest;

(d) On the fourth cause of action, for an injunction permanently enjoining the Defendants from engaging in Defendants' Improper Actions, further breaching the Investor Rights Agreement and further interfering with the performance of the Loan Agreement; and

(e) For the costs and disbursements incurred by Lamassu in this matter, including reasonable attorneys' fees, and for such other and further relief as may be just and proper.

Dated: April 9, 2012

KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

By: _____

Marc R. Rosen
David Parker
Netra Sreeprakash

551 Fifth Avenue, 18th Floor
New York, New York 10176
Telephone: (212) 986-6000
Facsimile: (212) 986-8866

Attorneys for Plaintiff
LAMASSU HOLDINGS, L.L.C.

# EXHIBIT A

<u>**EXECUTION COPY**</u>

**INVESTOR RIGHTS AGREEMENT**

**by and among**

**ACCESSDATA CORP.,**

**THE FOUNDING STOCKHOLDERS, as defined herein**

**and**

**THE INVESTOR, as defined herein**

**Dated as of July 30, 2007**

# TABLE OF CONTENTS

<u>Page #</u>

ARTICLE 1 RESTRICTIONS ON TRANSFER ............................................................................ 1
    Section 1.1    Restrictions on Transfer by Stockholders .................................................. 1
    Section 1.2    Restrictions on Transfer by the Investor ................................................... 2
    Section 1.3    Prohibited Transfers ................................................................................. 2
ARTICLE 2 RIGHTS TO PURCHASE ...................................................................................... 2
    Section 2.1    Right to Participate in, and Consent to, Certain Sales of Additional Securities . 2
    Section 2.2    Assignment of Rights ............................................................................... 3
ARTICLE 3 BOARD OF DIRECTORS ....................................................................................... 3
    Section 3.1    Board of Directors Designees .................................................................. 3
    Section 3.2    Board Composition .................................................................................. 3
    Section 3.3    Removal; Vacancies ................................................................................. 3
ARTICLE 4 VOTING ............................................................................................................... 4
    Section 4.1    Voting ..................................................................................................... 4
    Section 4.2    Approval of a Qualified Transaction ....................................................... 5
    Section 4.3    Qualified Transaction .............................................................................. 5
    Section 4.4    Grant of Irrevocable Proxy. ..................................................................... 6
ARTICLE 5 MISCELLANEOUS PROVISIONS .......................................................................... 7
    Section 5.1    Construction of Terms ............................................................................. 7
    Section 5.2    Number of Shares of Stock ....................................................................... 7
    Section 5.3    Defined Terms ......................................................................................... 7
    Section 5.4    Survival of Covenants .............................................................................. 8
    Section 5.5    Legend on Securities ................................................................................ 8
    Section 5.6    Amendment and Waiver ........................................................................... 8
    Section 5.7    Notices .................................................................................................... 9
    Section 5.8    Headings ............................................................................................... 10
    Section 5.9    Counterparts ......................................................................................... 10
    Section 5.10    Remedies; Severability ......................................................................... 10
    Section 5.11    Entire Agreement ................................................................................. 10
    Section 5.12    Adjustments ......................................................................................... 10
    Section 5.13    Law Governing ..................................................................................... 10
    Section 5.14    Successors and Assigns ......................................................................... 11
    Section 5.15    Venue ................................................................................................... 11
    Section 5.16    Trial By Jury ........................................................................................ 11
    Section 5.17    Term ..................................................................................................... 11

## INVESTOR RIGHTS AGREEMENT

**THIS INVESTOR RIGHTS AGREEMENT** (this "Agreement") is made as of this 30th day of July, 2007 by and among AccessData Corp., a Utah corporation (the "Company"), the stockholders of the Company identified as such on the signature pages hereto (the "Founding Stockholder"), the person identified on the signature pages hereto as the investor (the "Investor"), and any other stockholder or optionholder who from time to time becomes party to this Agreement by execution of a Joinder Agreement in substantially the form attached hereto as Exhibit A (the "Other Stockholders"). The Founding Stockholders and the Other Stockholders are herein referred to collectively as the "Stockholders" and individually as a "Stockholder."

WHEREAS, reference is made to (i) the Stock Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), pursuant to which the Investor has the option, and has agreed, under certain circumstances, to purchase shares of Common Stock from certain Stockholders upon the terms and conditions specified therein (ii) the Loan Agreement, dated as of the date hereof (the "Loan Agreement"), pursuant to which the Investor has agreed to provide certain loans to the Company and has the option, and has agreed, under certain circumstances, to convert loan amounts into shares of Common Stock of the Company, upon the terms and conditions specified therein;

WHEREAS, the execution and delivery of this Agreement is a condition precedent to the transactions contemplated by the Purchase Agreement and the Loan Agreement; and

WHEREAS, the parties hereto desire to agree upon the terms upon which the outstanding securities of the Company, now or hereafter outstanding and held by them will be held, transferred and voted.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

### ARTICLE 1

### RESTRICTIONS ON TRANSFER

Section 1.1    Restrictions on Transfer by Stockholders.    Each Stockholder agrees that he will not, without the prior written consent of the Investor, Transfer all or any portion of the Common Shares or the Preferred Shares now owned or hereafter acquired by him, except in connection with, and in compliance with the conditions of, any of the following:

(a)    Transfers by any Stockholder to his parents, siblings, spouse or children or to a trust of which he is the settlor and a trustee for the benefit of his spouse or children; provided, that any such trust or entity is legally prohibited from distribution of such Common Shares and/or Preferred Shares during the term of this Agreement, as amended or extended; and provided further, that the transferee shall have entered into a Joinder Agreement providing that all Common Shares and/or Preferred Shares so transferred shall continue to be subject to all provisions of this Agreement as if such Common Shares and/or Preferred Shares were still held by such Stockholder, except that no further transfer shall thereafter be permitted during the term of this Agreement, as amended or extended; and

(b)      Transfers upon the death of any Stockholder to his heirs, executors or administrators or to a trust under his will or Transfers between such Stockholder and his guardian or conservator, provided that the transferee shall have entered into a Joinder Agreement providing that all Common Shares and/or Preferred Shares so transferred shall continue to be subject to all provisions of this Agreement as if such Common Shares and/or Preferred Shares were still held by such Stockholder, except that no further transfer shall thereafter be permitted hereunder during the term of this Agreement, as amended or extended;

Any permitted transferee described in clauses (a) or (b) above shall be referred to herein as a "Permitted Transferee." Anything to the contrary in this Agreement notwithstanding, Permitted Transferees shall be deemed to take any Common Shares and/or Preferred Shares so transferred subject to all provisions of this Agreement as if such Common Shares and/or Preferred Shares were still held by the transferring Stockholder, whether or not they so agree in writing. All Common Shares shall be so legended.

Section 1.2    Restrictions on Transfer by the Investor.    The Investor may Transfer its Common Shares, provided that, as a condition to any Transfer of its Common Shares, the Investor agrees to cause the transferee to agree to the provisions of this Agreement, whereupon such transferee shall be subject to the provisions hereof to the same extent as the Investor in connection with its ownership of the Common Shares transferred for purposes of this Agreement.

Section 1.3    Prohibited Transfers.    If any transfer is made or attempted contrary to the provisions of this Agreement, such purported transfer shall be void ab initio; the Investor and the other parties hereto shall have, in addition to any other legal or equitable remedies which they may have, the right (but not the obligation) to enforce the provisions of this Agreement by actions for specific performance (to the extent permitted by law); and the Company shall refuse to recognize any transferee as one of its Stockholders for any purpose, unless the Investor, in its sole discretion, consents in writing to such recognition.

## ARTICLE 2

## RIGHTS TO PURCHASE

Section 2.1    Right to Participate in, and Consent to, Certain Sales of Additional Securities. The Company agrees that it will not sell or issue (i) any shares of capital stock of the Company, (ii) securities convertible into or exchangeable for capital stock of the Company or (iii) options, warrants or rights carrying any rights to purchase capital stock of the Company, unless the Company (x) first submits a written offer to the Investor, identifying the terms of the proposed sale (including price, number or aggregate principal amount of securities and all other material terms), and offers to the Investor or its assignee, as determined by the Investor in its sole discretion, the opportunity to purchase such securities on terms and conditions, including price, not less favorable than those on which the Company proposes to sell such securities to a third party or parties and (y) obtains the Investor's prior written consent to such transaction, which consent may be withheld by the Investor in its sole discretion, for any or no reason. The Company's offer pursuant to this Section 2.1 shall remain open and irrevocable for a period of thirty (30) calendar days, and the Investor or its assignee shall elect to purchase such securities

2

by giving written notice thereof to the Company within such 30-day period, including therein the maximum number of shares of capital stock or other securities of the Company which the Investor or its assignee would purchase. Any securities so offered which are not purchased pursuant to such offer may be sold by the Company, but only on the terms and conditions set forth in the initial offer, at any time within 120 calendar days following the termination of the above-referenced 30-day period but may not be sold to any other person or on terms and conditions, including price, that are more favorable to the purchaser than those set forth in such offer or after such 120-day period without renewed compliance with this Section 2.1.

Section 2.2    Assignment of Rights.  Subject to Section 1.2, the rights of the Investor set forth in this Article 2 are transferable to any transferee of Common Shares by the Investor.

## ARTICLE 3

## BOARD OF DIRECTORS

Section 3.1    Board of Directors Designees.  The parties hereto agree that:

(a)    The Board of Directors shall have five (5) members.

(b)    Eric Thompson (i) will serve as a member of the Board of Directors and (ii) will have the right to nominate one additional member of the Board of Directors, provided that such person is acceptable to the Investor.

(c)    Timothy Leehealey will serve as a member of the Board of Directors.

(d)    the Investor will have the right to nominate one member of the Board of Directors, provided that such person is acceptable to Eric Thompson.

(e)    The Investor and Eric Thompson will together nominate the fifth member of the Board of Directors, who will serve only with the mutual consent of the Investor and Eric Thompson, and each of the Investor and Eric Thompson will have the right to require the resignation of such Board member; provided that whenever the Investor and Eric Thompson cannot agree on who will serve as the fifth member of the Board of Directors, the then-current President of the Company will serve as the fifth member of the Board of Directors, subject to being removed by the mutual consent of the Investor and Eric Thompson.

Section 3.2    Board Composition.  Each Stockholder (including, for purposes of this Section 3.2, each Permitted Transferee) and the Investor agree to vote all of their respective shares of the capital stock of the Company having voting power (and any other shares over which they exercise voting control), to the extent they hold such shares of capital stock at the relevant time, in favor of the Board of Directors comprised in accordance with Section 3.1 above.

Section 3.3    Removal; Vacancies.

3

(a)     In the event one or more members of the Board of Directors become unwilling or unable to serve, the person or persons who nominated such member or members (or the person who personally had been a nominee to the Board of Directors pursuant to Section 3.1 hereof) will have the right to nominate a substitute or substitutes therefor. In the event of legal incompetency of Timothy Leehealey, the Investor shall have the right to nominate a substitute therefor. In the event of legal incompetency of Eric Thompson, the majority of the Company's stockholders shall have the right to nominate a substitute therefor.

(b)     In the event one or more members are removed from the Board of Directors, such removal shall be subject to the consent of the person or persons who nominated such member or members, and the person or persons who nominated such member or members (or the person who personally had been a nominee to the Board of Directors pursuant to Section 3.1 hereof) will have the right to nominate a substitute or substitutes therefore. Further, the person or persons who nominated a member or members will have the right to remove such member or members in its sole power and discretion.

(c)     Each Stockholder (including, for purposes of this Section 3.3, each Permitted Transferee) and the Investor agree to vote all of their respective shares of the capital stock of the Company having voting power (and any other shares over which they exercise voting control), to the extent they hold such shares of capital stock at the relevant time, for the removal of any director upon the request of the Persons then entitled to nominate such director and for the election to the Board of Directors of a substitute designated by such party in accordance with the provisions hereof. The Investor and each Stockholder further agrees to vote all of their respective shares of the capital stock of the Company having voting power (and any other shares over which he or it exercises voting control) in such manner as shall be necessary or appropriate to ensure that any vacancy on the Board of Directors occurring for any reason shall be filled only in accordance with the provisions of this Article 3.

## ARTICLE 4

## VOTING

Section 4.1     Voting.

(a)     The parties hereto agree that Stockholders, during the term hereof, agree to vote their respective shares of the Company's capital stock having voting power (and any other shares over which they exercise voting control), to the extent they hold such shares of capital stock at the relevant time as follows: forty-one percent (41%) ("Investor Voting Percentage") of such shares as directed by the Investor, provided that such Investor Voting Percentage shall be reduced each time the Investor acquires shares of Common Stock pursuant to (i) the conversion of the loan amounts under the Loan Agreement and/or (ii) the exercise of option under the Purchase Agreement as follows: Investor Voting Percentage shall be reduced by (x) the percentage of the Company's then outstanding Common Stock represented by the number of shares of Common Stock into which loan amounts under the Loan Agreement were converted and/or (y) the percentage of the Company's then outstanding Common Stock represented by the number of shares of Common Stock acquired by the Investor pursuant to the Purchase Agreement.

4

(b)     Except for where this Agreement explicitly requires all parties to vote all their respective shares of the Company's capital stock having voting power (and any other shares over which they exercise voting control), (e.g., Section 3.2), it is the intention of the parties that the Thompson Group and the Leehealey Group (each as defined below) will exercise equal voting power with respect to all future purchases of the Company's securities having voting power by, respectively, the Leehealey Group or the Thompson Group (the "Future Purchases," it being understood that the acquisitions by the Investor pursuant to the Loan Agreement and/or the Stock Purchase Agreement are not Future Purchases and that such acquisitions are specifically excluded from the application of the provisions contained in this paragraph (b)). To that end, if (i) the Leehealey Group effect one or more Future Purchases, then Leehealey Group agrees to vote fifty percent (50%) of the voting power it acquired in each such Future Purchase as directed by the Thompson Group and (ii) the Thompson Group effect one or more Future Purchases, then the Thompson Group agrees to vote fifty percent (50%) of the voting power it acquired in each such Future Purchase as directed by the Leehealey Group. For purposes of this Agreement, (i) the "Thompson Group" shall mean all direct descendants (by birth or adoption) of Betty Thompson, together with the spouses of those descendents and any trusts or similar legal entities benefiting those descendants and their spouses, and (ii) the "Leehealey Group" means any affiliated person or entity that can trace its share ownership directly or indirectly back to Timothy Leehealey.

Section 4.2     Approval of a Qualified Transaction.     The Investor and the Stockholders agree to vote their respective Common Shares in favor of a Qualified Transaction (as defined below) and to take all reasonably necessary action to effect such Qualified Transaction. Stockholders shall have the right to compel the Investor to, and the Investor hereby agrees to, Transfer all of the Common Shares owned, directly or indirectly, by the Investor, to effect the Qualified Transaction. The Investor shall share the right to compel the Stockholders to, and Stockholder hereby agree to, Transfer all of the Common Shares owned, directly or indirectly by such Stockholders, to effect such Qualified Transaction.

Section 4.3     Qualified Transaction.     A "Qualified Transaction" shall mean any change of Control Transaction as to which neither Eric Thompson nor Timothy Leehealey exercised their respective veto rights set forth below:

(a)     Eric Thompson and Timothy Leehealey will each have veto right on any Change of Control Transaction in which the Company is valued at less than $125,000,000.

(b)     Eric Thompson and Timothy Leehealey will each have veto right on any Change of Control Transaction in which the Company is sold to an entity whose primary business is investing in public and/or private securities.

(c)     Eric Thompson and Timothy Leehealey will each have veto right on any Change of Control Transaction in which the control would be transferred to Guidance Software (GUID), a parent company with 10% or more ownership of Guidance Software or any entity functioning as a "group" with Guidance Software.

(d)    Eric Thompson and Timothy Leehealey will each have veto right on any Change of Control Transaction in which the Company is valued at less than $150,000,000 in which Eric Thompson would receive less than 40% of the consideration in cash or less than 40% in stock of the acquiring company.

(e)    Eric Thompson and Timothy Leehealey will each have veto right on any Change of Control Transaction in which the Company is valued at less than $200,000,000 if the company sales for the calendar year preceding the proposed sale was greater than the listed targets:

2007 - $12,300,000

2008 - $19,200,000

2009 - $31,200,000

2010 - $48,875,000

2011 - $68,400,000

(f)    All veto rights will terminate after December 31, 2011 at which point all transactions will be determined based on a majority shareholder vote.

Section 4.4    Grant of Irrevocable Proxy.

(a)    THE STOCKHOLDERS HEREBY APPOINT TIMOTHY LEEHEALEY, INDIVIDUALLY, AS STOCKHOLDERS' PROXY PURSUANT TO THE PROVISIONS OF THE UTAH BUSINESS CORPORATIONS ACT, WITH FULL POWER OF SUBSTITUTION OR RESUBSTITUTION, TO VOTE OR ACT BY WRITTEN CONSENT WITH RESPECT TO THE STOCKHOLDERS' COMMON SHARES REPRESENTING THE INVESTOR VOTING PERCENTAGE (THE "SUBJECT SHARES"), ONLY TO ACCOMPLISH THE PURPOSE AND AGREEMENTS SET FORTH IN THIS AGREEMENT. THIS PROXY IS GIVEN TO SECURE THE PERFORMANCE OF THE OBLIGATIONS OF THE STOCKHOLDERS UNDER THIS AGREEMENT. THE STOCKHOLDERS AFFIRM THAT THIS PROXY IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE. THE STOCKHOLDERS SHALL TAKE SUCH FURTHER ACTION AND EXECUTE SUCH OTHER INSTRUMENTS AS MAY BE NECESSARY TO EFFECTUATE THE INTENT OF THIS PROXY.

(b)    The Stockholders represent that any proxies heretofore given in respect of the Subject Shares are not irrevocable, and that all such proxies are hereby revoked.

6

## ARTICLE 5

## MISCELLANEOUS PROVISIONS

Section 5.1   Construction of Terms.  As used herein, the masculine, feminine or neuter gender, and the singular or plural number, shall be deemed to be or to include the other genders or number, as the case may be, whenever the context so indicates or requires.

Section 5.2   Number of Shares of Stock.  Whenever any provision of this Agreement calls for any calculation based on a number of shares of capital stock of the Company held by (i) a Stockholder, the number of shares deemed to be held by that Stockholder shall be the total number of shares of Common Stock then owned by the Stockholder and (ii) the Investor, the total number of shares of Common Stock then owned by the Investor, plus the total number of shares of Common Stock issuable upon the conversion of any Preferred Stock or other convertible securities or the exercise of any vested options, warrants or subscription rights then owned by such Stockholder or the Investor.

Section 5.3   Defined Terms. The following capitalized terms, as used in this Agreement, shall have the meanings set forth below.

An "Affiliate" of any Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the first mentioned Person.  A Person shall be deemed to control another Person if such first Person possesses directly or indirectly the power to direct, or cause the direction of, the management and policies of the second Person, whether through the ownership of voting securities, by contract or otherwise.

"Board of Directors" means the Board of Directors of the Company.

"Change of Control Transaction" means a transaction or a series of related transactions, pursuant to which a party or parties, directly or indirectly, acquire (i) capital stock of the Company or the surviving entity possessing the voting power to elect a majority of the board of directors of the Company or the surviving entity (whether by merger, consolidation, sale or transfer of the Company's capital stock or otherwise) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

"Common Shares" means the shares of Common Stock.

"Common Stock" means the common stock, without par value, and any other common equity securities issued by the Company, and any other shares of stock issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization).

"Company" shall refer to the Company and any successor or successors thereto.

"Company's Annual Growth Rate" means the Company's trailing 12-month revenue divided by the Company's 12-month revenue in the previous 12-month period.

7

"Joinder Agreement" means the joinder agreement in the form annexed hereto as Exhibit A.

"Person" means an individual, a corporation, an association, a partnership, a limited liability company, an estate, a trust, and any other entity or organization, governmental or otherwise.

"Preferred Shares" means shares of the Preferred Stock.

"Preferred Stock" means the preferred stock of the Company, without par value, together with any shares issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or in replacement of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization).

"Transfer" means any direct or indirect transfer, donation, sale, assignment, pledge, hypothecation, grant of a security interest in or other disposal or attempted disposal of all or any portion of a security or of any rights. "Transferred" means the accomplishment of a transfer, and "transferee" means the recipient of a transfer.

Section 5.4    Survival of Covenants.  Each of the parties hereto agrees that each covenant and agreement made by it in this Agreement or in any certificate, instrument or other document delivered pursuant to this Agreement is material, shall be deemed to have been relied upon by the other parties and shall remain operative and in full force and effect after the date hereof regardless of any investigation.  This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties hereto and their respective successors and permitted assigns to the extent contemplated herein.

Section 5.5    Legend on Securities.  The Company, the Investor and the Stockholders acknowledge and agree that the following legend shall be typed on each certificate evidencing any of the securities issued hereunder held at any time by any of the Stockholders or their Permitted Transferees:

THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE PROVISIONS OF A CERTAIN INVESTOR RIGHTS AGREEMENT, DATED AS OF JULY 30, 2007, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER SET FORTH THEREIN.  A COMPLETE AND CORRECT COPY OF SUCH AGREEMENT IS AVAILABLE FOR INSPECTION AT THE PRINCIPAL OFFICE OF THE COMPANY AND WILL BE FURNISHED UPON WRITTEN REQUEST AND WITHOUT CHARGE.

Section 5.6    Amendment and Waiver.  Any party may waive any provision hereof intended for its benefit in writing.  No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof.  The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to any party hereto at law or in equity or otherwise.  This Agreement only may be amended with the prior written consent of the Investor.  Any consent given by the Investor as provided in the preceding sentence shall be binding on all Stockholders and Permitted Transferees, respectively, and no Stockholders, Permitted Transferee or the Investor shall have any cause of action against any other Person for any action taken by such Person in reliance upon such consent.  All actions

8

by the Company hereunder shall be taken by or upon the direction of a majority of the members of the Board of Directors of the Company.

Section 5.7    Notices. All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given, delivered and received (a) if delivered personally or (b) if sent by facsimile, registered or certified mail (return receipt requested) postage prepaid, or by courier guaranteeing next day delivery, in each case to the party to whom it is directed at the following addresses (or at such other address for any party as shall be specified by notice given in accordance with the provisions hereof, provided that notices of a change of address shall be effective only upon receipt thereof). Notices delivered personally shall be effective on the day so delivered, notices sent by registered or certified mail shall be effective three days after mailing, notices sent by facsimile shall be effective when receipt is acknowledged, and notices sent by courier guaranteeing next day delivery shall be effective on the earlier of the second business day after timely delivery to the courier or the day of actual delivery by the courier:

If to the Company:

AccessData Corp.
384 South 400 West
Suite 200
Lindon, UT  84042
Facsimile:  (801) 765-4370
Attn: Kent Millington, President and Chief Executive Officer

With a copy to:

Dorsey & Whitney LLP
170 South Main Street, Suite 900
Salt Lake City, UT 84010
Facsimile: (801) 933-7373
Attn: Nolan S. Taylor, Esq.


If to the Investor:
Lamassu Capital, L.P.
21 Whitesands
Newport Coast, CA  92657
Facsimile: (949) 706-1347
Attn:  Mr. Timothy Leehealey, General Partner

With a copy to:


Kleinberg, Kaplan, Wolf & Cohen, P.C.
551 Fifth Avenue
New York, NY 10176

9

Facsimile: (212) 986-8866
Attn: Lawrence D. Hui, Esq.

If to Stockholders, at the address shown for such Stockholder on the signature page hereto.

Section 5.8    Headings. The Article and Section headings used or contained in this Agreement are for convenience of reference only and shall not affect the construction of this Agreement.

Section 5.9    Counterparts. This Agreement may be executed in one or more counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which together shall be deemed to constitute one and the same agreement.

Section 5.10    Remedies; Severability. It is specifically understood and agreed that any breach of the provisions of this Agreement by any Person subject hereto will result in irreparable injury to the other parties hereto, that the remedy at law alone will be an inadequate remedy for such breach, and that, in addition to any other legal or equitable remedies which they may have, such other parties may enforce their respective rights by actions for specific performance (to the extent permitted by law) and the Company may refuse to recognize any unauthorized transferee as one of its Stockholders for any purpose, including, without limitation, for purposes of dividend and voting rights, until the relevant party or parties have complied with all applicable provisions of this Agreement.

In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be in any way impaired thereby, it being intended that all of the rights and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

Section 5.11    Entire Agreement. This Agreement, together with the Purchase Agreement and any other agreements specifically contemplated hereby and thereby, is intended by the parties as a final expression of their agreement and intended to be complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein. This Agreement and the Purchase Agreement and other agreements specifically contemplated hereby and thereby (including the exhibits hereto and thereto) supersede all prior agreements and understandings between the parties with respect to such subject matter.

Section 5.12    Adjustments. All references to share prices and amounts herein shall be equitably adjusted to reflect stock splits, stock dividends, recapitalizations and similar changes affecting the capital stock of the Company.

Section 5.13    Law Governing. This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of New York (without giving effect to principles of conflicts of law).

10

Section 5.14   Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto as contemplated herein, and any successor to the Company by way of merger or otherwise shall specifically agree to be bound by the terms hereof as a condition of such successor. The rights of the Investor hereunder shall be assignable to transferees of its Common Shares as contemplated herein. This Agreement may not be assigned by any Stockholders, except as provided herein, without the prior written consent of the Investor and, without such prior written consent, any attempted assignment shall be null and void.

Section 5.15   Venue.   Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any federal or state court located in the State of New York in the event any dispute arises out of this Agreement (including exhibits hereto) or any of the transactions contemplated hereunder, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court and (c) agrees that it shall not bring any action relating to this Agreement or any of the transactions contemplated hereunder in any court other than a federal or state court sitting in the State and of New York.

Section 5.16   Trial By Jury.   EACH OF THE PARTIES HERETO, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING, INCLUDING, WITHOUT LIMITATION, ANY TORT ACTION, BROUGHT BY EITHER PARTY HERETO WITH RESPECT TO THIS AGREEMENT AND/OR EXHIBITS HERETO.

Section 5.17   Term.   This Agreement shall remain in effect until the closing of a Qualified Transaction, provided that (i) Article 3 shall terminate in any event at the earlier of the Company's issuance of freely tradeable securities with voting power or the date which is 20 years after the date hereof and (ii) Article 4 shall terminate in any event on the date which is 20 years after the date hereof.

*[SIGNATURE PAGE FOLLOWS]*

11

IN WITNESS WHEREOF, the parties hereto have caused this Investor Rights Agreement to be duly executed as of the date first set forth above.

THE COMPANY:

ACCESSDATA CORP.

By: _____

Name: Kent Millington
Title: President and Chief Executive Officer

FOUNDING STOCKHOLDERS:

Eric Thompson
Address: 7188 Ox Bow Cicle, Tallahasa Fl 32312
Facsimile: _____

Betty Thompson

_____
Address: _____
Facsimile: _____

San Juan Gifting Trust

By: _____
Name: Raquelle Morse
Title: Trustee
Address: _____
Facsimile: _____

Slick Rock Canyon Unitrust

By: _____
Name: Eric Thompson
Title: Trustee

Investor Rights Agreement Signature Page

IN WITNESS WHEREOF, the parties hereto have caused this Investor Rights Agreement to be duly executed as of the date first set forth above.

THE COMPANY:

ACCESSDATA CORP.

By: _____

Name: Brent Millington
Title: President and Chief Executive Officer

FOUNDING STOCKHOLDERS:

Eric Thompson

Address: 7188 Ox Bow Circle, Tallahassee FL 32312
Facsimile: _____

Betty Thompson

Address: 11321 Orangewood Rd, Santa Rosa CA 92705
Facsimile: 714-832-6516

San Juan Gifting Trust

By: _____
Name: Raquelle Morse
Title: Trustee
Address: _____
Facsimile: _____

Slick Rock Canyon Unitrust

By: _____
Name: Eric Thompson
Title: Trustee